891 A.2d 355

**William Ivan JANEY**

v.

**STATE of Maryland.**

**No. 240, Sept.Term, 2004.**

Court of Special Appeals of Maryland.

Jan. 31, 2006.

Davis, J., concurred and filed a separate opinion.

Geraldine K. Sweeney (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellant.

Sarah Page Pritzlaff (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, ADKINS and MEREDITH, JJ.

MEREDITH, J.

A jury in the Circuit Court for Calvert County convicted William Ivan Janey of the second degree murder of his wife

and obstruction of justice in concealing the murder. In his brief in this Court, Janey raised two issues for our consideration:

1.  Whether the trial court abused its discretion by refusing to instruct the jury as requested on the issue of cross-racial identification.

2.  Whether the evidence is sufficient to sustain Janey's conviction for obstruction of justice.

We revisit our decision in *Smith v. State*, 158 Md.App. 673, 679, 857 A.2d 1198 (2004), *rev'd on other grounds, Smith and Mack v. State*, 388 Md. 468, 880 A.2d 288 (2005), in which we held that it is within the trial judge's discretion to decide whether to give a requested jury instruction regarding cross-racial eyewitness identification. We conclude that the Court of Appeals's ruling in *Smith and Mack* that, in some circumstances, cross-racial identification is a permissible subject of comment in closing argument does not impose an obligation upon the trial judge to give a separate instruction on this issue. We shall hold that the decision of whether to give such an instruction, when requested, remains committed to the sound discretion of the trial judge. We find no abuse of discretion in the trial judge's refusal to give the requested jury instruction in Janey's case, and shall affirm the conviction for second degree murder.

The State concedes that the evidence was not sufficient to sustain the conviction for obstruction of justice, and we shall reverse that conviction.

### Background

At Janey's trial, Eugene Jones, who was one of Janey's long-time friends, testified, under a grant of immunity, that Janey had called him on the evening of April 1, 2003, and asked him to go for a ride. Jones testified that when Janey picked him up, Janey asked him if he had any shovels. Jones borrowed two shovels from his sister's house, and went for a ride in Janey's pickup truck.

According to Jones's testimony, Janey and Jones first drove to the St. Leonard's Seventh Day Adventist Church, and dug a hole large enough to dispose of a body. After digging the hole, they stopped at two filling stations, and at each gas station, they "threw something in the trash." At the second filling station, Janey asked Jones to help him unbolt the large metal toolbox that was fastened to the rear of the pickup. Jones noted that Janey asked the "little foreign guy" who owned the station for a tool to assist them. According to Jones, Janey "knew the guy, so he went in and asked him, and he came and helped us out." They eventually loosened all of the bolts.

Jones further testified that Janey then drove him to Janey's apartment, and asked him to help carry the toolbox from the pickup to the apartment. When they reached the apartment, Jones observed scratches on Janey's face, and Janey told Jones that his wife, Ebony Janey, had scratched him. Janey confessed to Jones that he had gotten into an argument with his wife, and "[t]hat he killed her, that he broke her neck." Janey showed Jones Ebony Janey's dead body, and enlisted Jones's assistance in disposing of the body and cleaning up the apartment. The two men placed the dead body in the large toolbox, then carried the box downstairs to the pickup, and drove back to the hole they had dug, where they buried Ebony Janey's body.

In the course of investigating Mrs. Janey's disappearance, the police interviewed Jones because he was a known associate of Mr. Janey. Jones was initially uncooperative, but eventually, through legal counsel, Jones agreed to provide information regarding Mrs. Janey's disappearance if Jones were granted immunity. After arrangements were made that were satisfactory to Jones and his attorney, Jones led police to the grave containing Mrs. Janey's body, and testified at Janey's trial as summarized above.

One of the witnesses the prosecution called at trial to corroborate Jones's story was Zaheer Akhtar, who was identified as the "foreign guy" from the second gas station men-

tioned in Jones's account of events. Mr. Akhtar identified Janey as one of two men who came to his gas station on the night of April 1, 2003. Mr. Akhtar's testimony included the following:

[PROSECUTOR:] On the evening of April 1st, 2003 did you speak with someone who needed help loosening some bolts on the tool box in the back of a pickup truck?

A Yes, ma'am.

Q Can you tell the ladies and gentlemen of the jury about that?

A I was sitting in my office and a gentleman pointed me [sic] from my garage door. He signaled me like that. I went outside. He was trying to take the tool box off the truck. He asked me for the specific socket ... for the taking the bolt off the tool box, and he was asking me actually the wrong socket, but I told him which one he needed. I went to try to help him. In the meantime he already taken care of that.

Q So he asked you for help, but by the time you could get him the right socket he had already gotten it?

A He has already got it off.

Q Was there two gentlemen there or just one?

A Two.

Q Now, the one who was talking to you, do you recall if there was anything unusual about his face?

A Yes. I saw scuff, you know, like I describe on my paper on testimony before. It's a shiny, you know, face on—like a cat type, you know, like you defend some—somebody. It was like Vaseline, you know, on his face.

\* \* \*

Q So it was scratches?

A Yes.

Q Like a cat?

A Yes, ma'am.

Q And then there was Vaseline on top of the scratches?

A On the top of them, I mean the shiny thing. So I describe Vaseline, it could be anything else.

Q It looked to you like Vaseline?

A Yes.

Q Now, this person with the scratches on his face, had you seen him before?

A I saw him once before.

Q And how was it you came to see him once before?

A One time he asking me if I can switch couple tires for him, he—I talked to him.

Q So he had been in your shop before?

A Just one time.

Q Is that person that you spoke to that night that you helped, is he in the courtroom today?

A Yes.

Q Can you identify him please for the ladies and gentlemen of the jury?

A He is right over there.

On cross-examination, defense counsel brought out the fact that Mr. Akhtar had previously had difficulty selecting Janey's picture from an array of six photographs. Mr. Akhtar further admitted that he has difficulty identifying African Americans:

[DEFENSE COUNSEL:] And at the time that you looked at these photos at least by [the detective's] account it took you about two minutes, is that a fair—

A I guess it was.

Q And at the time that you looked at the pictures Detective Whitacker said that you had indicated it could be that person?

A I said—because I told him I said I am not very good with, you know, these kind of faces. If—I said if you look at Asian face, a whole bunch of them, you will not recognize. But if I see a whole bunch of African American face, I'll probably miss, you know, I'm not very good picking. So I said I know this is person here, but I could be—but I said if

I see him again, I will point it very quickly. Because these faces, if you look at it, it look like same, you know.

Q So you were a little unsure when you looked at the photographs?

A Yes, but then I pointed, I said, yes, this is the person.

Q Now ... did Detective Whitacker ever say, well, let's do a line-up where you could actually see the people?

A No.

Q The only thing he did was this photo spread?

A That's exactly.

Q And the of course seeing Mr. Janey sitting here today?

A Yes. Yes.

\* \* \*

Q Now, after you picked out picture number four you asked Detective Whitacker if you had picked the right person, did you not?

A Well, I was just asking like did I did right thing for you, he said I can't tell you.

Q But you were still unsure, you wanted to ask him if you had picked the right person?

A Well, I just want to ask him, you know, just formality.

\* \* \*

Q And you called [the defendant] Mr. Janey. Did you know his name was Janey before all of this happened?

A No, not really the name, but I met him one time before. He came to my shop. He said—he was nice person. He told me he moved in this county and he needs a couple tire change. I help him out, and he told me he just moved in, and his brother was helping him with his tires and stuff like that. So, you know, that's why he pointed me, and he said you remember me, I said yes, I remember you.

Q But at the time this happened in April you didn't know his name was William Janey, did you?

A No. No.

\* \* \*

Q ... but the reason you used the name Janey today is because you have learned the name Janey between April and now?

A ... exactly.

On redirect examination, Mr. Akhtar responded "yes" when asked whether, even though he could not recall the date Janey came to the station, he was "sure that the person [he] saw that night had scratches on his face."

Relying upon the concurring opinion of Chief Judge Bazelon in *United States v. Telfaire,* 469 F.2d 552, 561 (D.C.Cir.1972), the defense requested that the trial court instruct the jury as follows with respect to the reliability of cross-racial identification:

In this case, the identifying witness is of a different race than the defendant. In the experience of many, it is more difficult to identify the members of a different race than members of one's own. If this is also your own experience, you may consider it in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of the defendant's race that [he] would not have great difficulty in making a reliable identification.

(The requested instruction is identical to the instruction on cross-racial identification that was requested, but not given, in *Smith v. State,* 158 Md.App. 673, 679, 857 A.2d 1198 (2004), *rev'd on other grounds, Smith and Mack v. State,* 388 Md. 468, 880 A.2d 288 (2005).)

The trial judge refused to give this instruction. He instead charged the jury using the Maryland Criminal Pattern Jury Instructions relating to credibility of witnesses and identification testimony, MPJI–Cr. 3:10 and 3:30:

You are the sole judges of whether—or judge of whether a witness should be believed. In making this decision you may apply your own common sense and every day experiences. In determining whether a witness should be be-

lieved you should carefully judge all the testimony and evidence and the circumstances under which the witness testified. You should consider such factors as the witness's behavior on the stand and manner of testifying, did the witness appear to be telling truth, the witness's opportunity to see or hear the things about which testimony was given, the accuracy of the witness's memory, does the witness have a motive not to tell the truth, does the witness have an interest in the outcome of the case, was the witness's testimony supported or contradicted by evidence that you believe, and whether and the extent to which the witness's testimony in court differed from the statements made by the witness on any previous occasion. You need not believe any witness, even if the testimony is uncontradicted. You may believe all, part, or none of the testimony of any witness.

\*     \*     \*

The burden is on the State to prove beyond a reasonable doubt that the offense was committed and the defendant was the person who committed it. You have heard evidence regarding the identification of the defendant as the person who committed the crime. In this connection you should consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the persons committing the crime, the witness's state of mind, and any other circumstances surrounding the event.

You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factors surrounding the identification.

The identification of the defendant by a single eyewitness as the person who committed the crime if believed beyond a reasonable doubt can be enough evidence to convict the defendant. However, you should examine the identification of the defendant with great care. It is for you to determine the reliability of any identification and give it the weight you believe it deserves.

After the trial judge instructed the jury, counsel for the defendant objected, as required by Maryland Rule 4–325(e), to the court's failure to give the requested instruction regarding cross-racial identification.

## Discussion

The general rule regarding jury instructions is that the trial judge "has a duty, upon request in a criminal case, to instruct the jury on the applicable law." *Gunning v. State,* 347 Md. 332, 347, 701 A.2d 374 (1997). Maryland Rule 4–325(c) provides:

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

In evaluating a trial court's refusal to charge a jury as requested, a reviewing court "must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case [*i.e.,* whether the evidence was sufficient to generate the desired instruction]; and whether it was fairly covered in the instructions actually given." *Gunning,* 347 Md. at 348, 701 A.2d 374 (quoting *Grandison v. State,* 341 Md. 175, 211, 670 A.2d 398 (1995), *cert. denied.,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996)).

In contrast to the judge's duty to instruct the jury as to the applicable law, however, there is generally no duty for a trial court to give instructions that emphasize particular facts in evidence. In *Patterson v. State,* 356 Md. 677, 684–85, 741 A.2d 1119 (1999), Judge Cathell wrote for the Court of Appeals:

> Maryland Rule 4–325(c) imposes a requirement that instructions be given in respect to the applicable law in a case. It does not apply to factual matters or inferences of fact. Instructions as to facts and inferences of fact are normally

not required. When a party fails to produce evidence, an inference may be made against it. . . .

. . . Elements, affirmative defenses and certain presumptions relate to the requirement that a party meet a burden of proof that is set by a legal standard. A trial judge must give such an instruction if the evidence generates the right to it because it sets the legal guidelines for the jury to act effectively as the trier of fact. An evidentiary inference, such as a missing evidence or missing witness inference, however, is not based on a legal standard but on the individual facts from which inferences can be drawn and, in many instances, several inferences may be made from the same set of facts. A determination as to the presence of such inferences does not normally support a jury instruction. While supported instructions in respect to matters of law are required upon request, instructions as to evidentiary inferences normally are not.

*Accord Lowry v. State,* 363 Md. 357, 374, 768 A.2d 688 (2001)(per curiam).

Notwithstanding the general rule that instructions relating to facts and inferences to be drawn from the evidence need not be given, the Court of Appeals has expressed concern that jurors may need guidance in some cases to assist them in evaluating eyewitness identification testimony. In *Gunning, supra,* the trial judge had rejected out of hand a request that the judge give MPJI–Cr 3:30 (regarding identification testimony). Judge Chasanow wrote for the Court of Appeals, 347 Md. at 354–55, 701 A.2d 374 (footnotes omitted)(emphasis added):

If a party requests an identification instruction in a criminal case, the trial judge must evaluate whether the instruction is applicable to the facts of the case at hand, keeping in mind that the purpose of a jury instruction is "to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727, 729 (1994). *When uncorroborated eyewitness testimony is a critical element of the State's case and*

*doubts have been raised about the reliability of that testimony, a request for an eyewitness identification instruction should be given careful consideration.* Conversely, a request for an eyewitness identification instruction may be rejected when there is corroboration of the defendant's participation in the crime, when the circumstances surrounding the eyewitness identification do not give rise to any reasonable doubts as to its accuracy, or when other instructions contain criteria or guidance that is similar to the requested instruction. Such determinations lie within the sound discretion of the trial court.

In *Gunning,* the trial judge in two separate cases had refused to give a requested eyewitness identification instruction. In each case, the defendant was convicted on the basis of uncorroborated eyewitness identification testimony. Each defendant had interposed a mistaken-identity defense, but the requested instruction was rejected in each instance because the trial court was of the opinion that identification was a question of fact that required no specific instruction to the jury. The trial judge further commented that he "never" gives a witness identification instruction, and that it was "regrettable" that MPJI–Cr 3:30 "found its way into the pattern jury instructions." 347 Md. at 339, 701 A.2d 374.

The Court of Appeals reversed, but in doing so, did not hold that the failure to give such an instruction was reversible error. Rather, after surveying the division of authority on the issue of whether identification instructions must be given in every case involving eyewitness testimony, the Court of Appeals declined to adopt a mandatory rule, and agreed with those courts that have "held that the decision as to whether to give such an instruction lies within the sound discretion of the trial court." *Gunning,* 347 Md. at 345, 701 A.2d 374 (footnote omitted). The Court stated: "We do not find instructions on such issues to be always mandatory, but neither do we consider them never necessary or *per se* improper as suggested by the trial judge. We instead recognize that an identification instruction may be appropriate and necessary in certain in-

stances, but the matter is addressed to the sound discretion of the trial judge." *Id.* at 348, 701 A.2d 374.

The reversible error in *Gunning* was that the trial judge had not exercised any discretion. As the Court of Appeals pointed out, "the judge's denial of the requested eyewitness identification instructions was not grounded on the exercise of judicial discretion; rather, the record . . . is clear that the denial was based on the application of a uniform policy [of the trial judge], a policy which arose from the judge's personal opinion that identification instructions are not 'appropriate.' " 347 Md. at 351, 701 A.2d 374. "[T]he requested identification instructions should have at least been given careful consideration in the instant cases, and arbitrarily rejecting them as always inappropriate was an abuse of discretion." 347 Md. at 353–54, 701 A.2d 374.

The Court in *Gunning* found "little merit" in the State's argument that an identification instruction as sought by the defense "goes beyond an explanation of the substantive law, and includes particular factors that the jury should consider in evaluating the identification testimony." *Id.* at 347, 701 A.2d 374. *But cf. Patterson v. State, supra,* 356 Md. at 684, 741 A.2d 1119 (because Rule 4–325(c) is inapplicable to factual matters, "regardless of the evidence, a missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion"); *Lowry v. State,* 363 Md. 357, 374, 768 A.2d 688 (2001) (quoting *Patterson* with approval); *Imes v. State,* 158 Md.App. 176, 193 n. 9, 855 A.2d 381 ("A trial judge is not required to give an instruction with respect to evidentiary inferences."), *cert. denied,* 384 Md. 158, 862 A.2d 994 (2004).

The Court in *Gunning* explained that an identification instruction such as MPJI–Cr 3:30 may be helpful in some cases:

In ruling on a request for an identification instruction, therefore, the trial judge must necessarily exercise discretion in assessing whether the instruction ought to be given and whether the issue of identification is fairly covered by other instructions. In many cases, detailed instructions on

such issues as witness credibility and/or the burden of proof may adequately encompass the subject matter of a requested identification instruction. In other cases, however, because of the centrality of the identification issue and the nature of the eyewitness testimony, a separate identification instruction might be helpful to the jury. Although jurors might know generally that a witness's perception, especially in times of stress, is not always reliable and that memory is not infallible, an identification instruction assists the jury in its task by pointing out the specific factors that may affect eyewitness identification. A credibility instruction that focuses primarily on honesty and bias may not adequately cover those factors, and thus may not be sufficient in some cases to assist the jury in evaluating whether an eyewitness is mistaken. In any event, the trial judge must examine the unique circumstances of each case before rejecting a requested eyewitness identification instruction. In particular, the trial judge should consider whether there is a real issue of mistaken identity generated by the defense, as well as such factors as whether the identification testimony is questionable because of the circumstances surrounding either the witnesses' observations or the identification procedures, and whether there is corroborating evidence concerning the defendant's participation in the crime.

*Gunning*, 347 Md. at 350, 701 A.2d 374.

It is clear, therefore, that an instruction that cautions the jury about pertinent factors that can affect the reliability of eyewitness identifications in general may be appropriate. Indeed, the witness identification instruction given by the trial judge in Janey's case, based upon MPJI–Cr 3:30, did address the factors highlighted in *Gunning*.

One question that was not specifically argued by Janey is whether the omission of any mention of the races of the witness and the defendant from the list of factors that may be considered could lead some jurors to conclude that they may not consider such facts. We note, however, that the pattern instructions do not purport to be exhaustive lists of permissible considerations. Rather, MPJI–Cr 3:30 instructs the jury

to consider certain factors "as well as any other factor surrounding the identification." Similarly, the more general pattern instruction regarding evaluation of witnesses, MPJI–Cr 3:10, instructs the jury: "[Y]ou may apply your own common sense and every day experiences." Moreover, if counsel are permitted, in some circumstances, to argue to the jury that cross-racial identifications may be less reliable, there is less danger of jurors concluding in such cases that this is an issue that may not be considered in evaluating the credibility of the witness's identification of the defendant.

In *Smith v. State, supra,* 158 Md.App. 673, 857 A.2d 1198, this Court was asked to find reversible error in the trial court's refusal to grant the same cross-racial identification instruction that was requested by Janey (*i.e.,* an instruction that would have told the jurors that, in addition to the factors mentioned in MPJI–Cr 3:30, they may also consider that, "[i]n the experience of many, it is more difficult to identify members of a different race than members of one's own"). In *Smith,* the African American defendants were convicted on the basis of the testimony of a single eyewitness, who was white. On appeal to this Court, the defendants asserted that the trial court erred, first, by refusing to instruct the jury on the difficulties of cross-racial identification, and, second, by refusing to allow defense counsel to refer in closing argument to that same identification issue.

A divided panel of this Court would have affirmed the conviction. There was no division among the judges of this Court, however, with regard to the requested instruction that addressed cross-racial identification: all three judges agreed that it was within the discretion of the trial court to refuse to give Chief Judge Bazelon's *Telfaire* instruction. 158 Md.App. at 696, 857 A.2d 1198 (Eyler, James, J.: "Under the holding of *Gunning,* that the giving of an eyewitness identification instruction lies within the discretion of the trial court, it necessarily follows that the giving of the instruction at issue in this case lies within the trial court's discretion."); 158 Md.App. at 708, 857 A.2d 1198 (Davis, J.: "Although I concur with the majority opinion that the lower court did not err in denying

the request of counsel to argue cross-racial identification to the jury, I write separately to express my profound concern that, in a proper case, counsel should be allowed latitude by the trial judge with respect to argument concerning matters legitimately a part of a judicial proceeding."); and 158 Md. App. at 711, 857 A.2d 1198 (Adkins, J.: "I agree that the trial court did not abuse its discretion in declining to instruct the jury on the difficulties of cross-racial identification.").

This Court split with regard to whether the trial court erred in refusing to permit defense counsel to address in closing argument the possibility that the identification of the defendants was less reliable because the witness was white and the defendants were African American. For the majority of this Court's panel, Judge Eyler wrote that the trial judge acted within her discretion in refusing to allow closing argument on cross-racial identification because there was not sufficient evidence in the record to support such an argument. Judge Davis, concurring, wrote separately to emphasize that counsel should be afforded latitude with respect to closing argument in an appropriate case. *Smith,* 158 Md.App. at 708–11, 857 A.2d 1198. Judge Adkins dissented, arguing that the trial judge did abuse her discretion by curtailing closing argument. *Smith,* 158 Md.App. at 711–18, 857 A.2d 1198.[1]

Upon further appellate review, in *Smith and Mack, supra,* 388 Md. at 470, 880 A.2d 288, the Court of Appeals reversed

---

1. We note that during closing argument in Janey's case, defense counsel emphasized the unreliability of Mr. Akhtar's identification. Without mentioning race, counsel argued:

    Zaheer Akhtar is not a positive identification. You can tell that from his testimony. He starts out with about four or five different statements according to him and according to Detective Whitacker. The first is it's number four. Then he equivocates, well, I think it's number four. And then when he is asked it could be number four, and then the best part is at the end of the whole process he said ["]did I pick the right person[?"] . . .

    \*        \*        \*

    . . . He is not positive. He is not sure. It's a reason to doubt.
    Janey did not contend that he should have been granted greater leeway to expressly argue that Mr. Akhtar's difficulty in identifying Janey was attributable to the fact that it was a cross-racial identification.

the convictions and remanded for a new trial, but specifically declined to address the question of whether the trial court erred by refusing to give a *Telfaire* instruction on cross-racial identification. The Court of Appeals gave this explanation for not addressing the question that had been raised regarding the trial court's obligation to give a jury instruction on cross-racial identification: "Because we hold that under the circumstances of this case, the trial judge erred in precluding the defendants from discussing cross-racial identification in their closing arguments and reverse the defendants' convictions, we do not reach the jury instruction question." *Id.* at 478, 880 A.2d 288.

█ Although the Court of Appeals expressed no opinion with respect to whether a *Telfaire* instruction would be required when the *Smith* case was retried and the defense counsel were expressly permitted to argue that cross-racial identifications are less reliable, we find nothing in the Court of Appeals's opinion that causes us to reach a conclusion different from the conclusion we reached previously in *Smith*, 158 Md.App. at 696, 857 A.2d 1198, namely, that "the giving of the instruction at issue in this case lies within the trial court's discretion."

In *Smith and Mack*, the Court of Appeals reviewed a variety of literature regarding cross-racial identification and concluded: "Overall, there is strong consensus among researchers conducting both laboratory and field studies on cross-racial identification that some witnesses are more likely to misidentify members of other races than their own." 388 Md. at 482, 880 A.2d 288. At the same time, however, the Court acknowledged continuing uncertainty regarding the topic, stating: "At this juncture the extent to which own-race bias affects eyewitness identification is unclear based on the available studies addressing this issue, so that we cannot state with certainty that difficulty in cross-racial identification is an established matter of common knowledge." *Id.* at 488, 880 A.2d 288.

Notwithstanding that lack of certainty, however, the Court of Appeals concluded that, under the circumstances of that case, the defendants had the right to comment on cross-racial identification in closing argument. The Court pointed out that "a criminal defendant's Sixth Amendment right to counsel guarantees, in part, an opportunity for counsel to present closing argument at the close of the evidence." *Id.* at 486, 880 A.2d 288 (quoting *Holmes v. State*, 333 Md. 652, 658–59, 637 A.2d 113 (1994)). The Court noted that trial advocates "are given wide latitude in the conduct of closing argument, including the right to explain or to attack all the evidence in the case." 388 Md. at 488, 880 A.2d 288 (quoting *Trimble v. State*, 300 Md. 387, 405, 478 A.2d 1143 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985)). Quoting from *Wilhelm v. State*, 272 Md. 404, 412–13 and 438, 326 A.2d 707 (1974), the Court noted that in closing argument, counsel " 'may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.' ... We also have held that in closing argument '[j]urors may be reminded of what everyone else knows, and they may act upon and take notice of those facts which are of such general notoriety as to be matters of common knowledge.' " 388 Md. at 487, 488, 880 A.2d 288.

After reviewing the broad scope of permissible closing arguments, and noting that "the victim's eyewitness cross-racial identification of the defendants ... was the sole piece of significant evidence" against Smith and Mack, *id.* at 488, 880 A.2d 288, and further noting that "the victim's identification of the defendants was anchored in her enhanced ability to identify faces," *id.* at 488–89, 880 A.2d 288, the Court of Appeals concluded that, "[u]nder these circumstances, defense counsel should have been allowed to argue the difficulties of cross-racial identification in closing argument." *Id.* at 489, 880 A.2d 288. The trial court's failure to permit such closing argument was reversible error.

We conclude that the holding of the Court of Appeals in *Smith and Mack*, which focused upon a defendant's right to counsel and the right to make closing arguments, did not

impose any new duty upon trial judges to give jury instructions addressing cross-racial identification. The underpinning of the Court's ruling in *Smith and Mack* was that it is reversible error for a trial court to prevent a defendant from attacking the prosecution's evidence during closing argument. That holding does not support the conclusion that a trial court commits reversible error if it declines to give the jury an instruction on cross-racial identification.

In this Court's opinion in *Smith*, Judge Eyler highlighted some of the difficult questions that begin to surface when the courts consider imposing a rule requiring instructions regarding factors to consider in witness identification:

> Should an eyewitness identification instruction always include a laundry list of specific factors based on the perceived common knowledge of men and women? When does such an instruction constitute an improper comment on the evidence by the court? More to the point here, if race is to be identified as a factor, should the same be true for ethnicity and other analogous factors? What is the rule for multi-racial persons? How does one determine race? Is race self-proclaimed? What is the rule for persons who marry persons of another race?

*Smith, supra,* 158 Md.App. at 702, 857 A.2d 1198. Such questions call to mind the comment made by Judge Leventhal in his concurring opinion in *Telfaire, supra,* 469 F.2d at 562: "The more I ponder the problems, the better I understand the kernel of wisdom in the decisions that shy away from instructions on inter-racial identifications as divisive."

As the dissent in *Smith and Mack* pointed out, 388 Md. at 495, 880 A.2d 288, there is a concern among some that jury instructions regarding the difference in race between the witness and defendant could spawn much mischief. The dissent noted that the Supreme Court of New Jersey has expressed reservations about the potential for appeals to racism, even though New Jersey has adopted a position requiring instructions on cross-racial identification. The dissent in *Smith and Mack,* 388 Md. at 494–95, 880 A.2d 288, quoted the

following comment from *State v. Cromedy,* 158 N.J. 112, 132, 727 A.2d 457, 467 (1999):

> At the same time, we recognize that unrestricted use of cross-racial identification instructions could be counter-productive. Consequently, care must be taken to insulate criminal trials from base appeals to racial prejudice. An appropriate jury instruction should carefully delineate the context in which the jury is permitted to consider racial differences. The simple fact pattern of a white victim of a violent crime at the hands of a black assailant would not automatically give rise to the need for a cross-racial identification charge. More is required.

■ In *Cromedy,* 727 A.2d at 467, the New Jersey Supreme Court emphasized that an instruction on cross-racial identification "should be given only when . . . [1] identification is a critical issue in the case, and [2] an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." Consequently, even if Janey had been tried in New Jersey, where the *Cromedy* standard requires that an instruction on cross-racial identification be given under certain circumstances, it would not have been reversible error for the trial judge to refuse to grant the instruction in Janey's case because (1) Akhtar's identification of Janey was not a critical issue in the case, and (2) in any event, Akhtar's identification was corroborated by Janey's childhood friend, Jones, who placed Janey at Akhtar's filling station.

Moreover, Akhtar candidly admitted that he was not good at identifying African Americans. This admission on Akhtar's part not only supported a closing argument commenting on the unreliability of his identification testimony, it also reduced the need for the jury to question whether Akhtar *might* be among the group of persons who have more difficulty with cross-racial identification; Akhtar admitted that he in fact has such difficulty. Under such circumstances, the requested *Telfaire* instruction—advising jurors that "[i]n the experience of many, it is more difficult to identify the members of a different race than members of one's own"—would have mere-

ly confirmed that Akhtar's self-professed difficulty in recognizing African American faces was consistent with "the experience of many." Given the facts of this case, the requested instruction could have had no significant influence on the outcome of deliberations.[2]

■ Conversely, the mere fact that a witness denies any difficulty in making cross-racial identifications should not deter the trial judge from considering giving such an instruction, particularly if, in the language of the *Cromedy* court, "identification is a critical issue in the case, and [the] eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." 727 A.2d at 467. Even in the face of a witness's strenuous denial of personal difficulty in making cross-racial identifications, because the

---

2. Appellant contends that Akhtar's identification of Janey was critical corroboration of the accomplice testimony of Eugene Jones, without which Jones's incriminating testimony would be insufficient to prove that appellant killed Ebony Janey. *See In re Anthony W.*, 388 Md. 251, 263–64, 879 A.2d 717 (2005). This argument misses the mark, however, because there was no evidence that Jones was an accomplice to the murder itself.

Even if Eugene Jones could have potentially been considered an accomplice to Janey's alleged obstruction of justice, such that Jones's testimony supporting that charge required corroboration, Jones was not an accomplice to the murder, but rather was an accessory after the fact. Appellant went to Jones to request help in preparing the grave and moving the body after the murder. The Court of Appeals has explained that " '[t]o be an accomplice a person must participate in the commission of the crime ... with common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime.' " *In re Anthony W., supra*, 388 Md. at 276, 879 A.2d 717 (quoting *Watson v. State*, 208 Md. 210, 219, 117 A.2d 549 (1955)). *Cf. Rivenbark v. State*, 58 Md.App. 626, 636 n. 3, 473 A.2d 1329 (accessory after fact does not qualify as accomplice), *cert. denied*, 300 Md. 795, 481 A.2d 240 (1984). Moreover, Akhtar's testimony corroborated more than Janey's *identification*. Even if Akhtar had been totally unable to say it was Janey who appeared at his filling station on the evening of April 1, 2003, Akhtar would nevertheless have been able to testify about two men stopping there that evening and asking for a tool to remove a toolbox. Such testimony would have corroborated Jones's testimony about stopping at the station to remove the toolbox, Janey's effort to borrow a tool from the station owner, and the fact that Janey had scratches on his face on that occasion, even if Akhtar could not have picked Janey's photo out in a photographic lineup.

studies cited by the Court of Appeals in *Smith and Mack*, 388 Md. at 478–86, 880 A.2d 288, indicate that there is a "strong consensus among researchers . . . that some witnesses are more likely to misidentify members of other races than their own," *id.* at 482, 880 A.2d 288, the trial judge must, upon request, consider whether an instruction is appropriate in the case.

■ Accordingly, our holding in this case—that the trial judge did not abuse his discretion in refusing to give the requested instruction on cross-racial identification—should not be interpreted as holding that it is never appropriate to give such an instruction. Nor should the fact that no instruction on cross-racial identification appears yet in the Maryland Criminal Pattern Jury Instructions serve as the basis for an arbitrary refusal to consider granting such an instruction. As the introduction to the current version of the pattern instructions states, MPJI–Cr. at xv: "We hope that this text will relieve judges and lawyers of the burden of drafting basic instructions. However, there is still the need to draft instructions, or modify instructions to accommodate the circumstances of a particular case." *Accord, Boone v. American Manufacturers*, 150 Md.App. 201, 232, 819 A.2d 1099 (" 'When the evidence generates an issue that is not covered by a pattern instruction, we must count on the court to incorporate relevant and valid legal principles gleaned from the case law.' " (quoting *Green v. State*, 119 Md.App. 547, 562, 705 A.2d 133 (1998))), cert. denied, 376 Md. 50, 827 A.2d 112 (2003). Just as the trial judge in *Gunning* abused his discretion by adopting a predetermined position of never giving the requested instruction, 347 Md. at 351–354, 701 A.2d 374, it would be an abuse of discretion for a trial judge to apply a uniform policy of rejecting all requested instructions that are not covered by some pattern instruction. "[A] court errs when it attempts to resolve discretionary matters by the application of a uniform rule, without regard to the particulars of the individual case." *Id.* at 352, 701 A.2d 374.[3]

---

3. The Court of Appeals emphasized in *Gunning, supra*, 347 Md. at 351, 701 A.2d 374, that the failure to exercise discretion can constitute an

Nevertheless, we acknowledge the tremendous assistance the pattern instructions provide to both the bench and bar, and we repeat what we said in *Smith, supra,* 158 Md.App. at 703–04, 857 A.2d 1198: "Assuming that, in a given case, it may be appropriate for a trial court to mention specific factors [the jury should consider in its evaluation of eyewitness testimony], including cross-racial identification, it would be helpful if the Court of Appeals provided guidance as to when and under what circumstances. The Court could utilize the Rules Committee and other committees, including the process for producing pattern jury instructions, if it sees fit to do so."

**JUDGMENT OF CONVICTION AND SENTENCE FOR SECOND DEGREE MURDER AFFIRMED; JUDGMENT OF CONVICTION AND SENTENCE FOR OBSTRUCTION OF JUSTICE REVERSED.**

**COSTS TO BE DIVIDED EVENLY.**

Concurring Opinion by DAVIS, J.

In *Smith,* 158 Md.App. at 709, 857 A.2d 1198, although mindful of the potential for mischief, my principal concern where an accused is denied the right to subject his accuser's identification to the scrutiny of counsel's analysis in closing argument and, in a proper case, to a standard set out in the court's instructions, has more to do with the vagaries of identification evidence, generally. Cross racial identification is

---

abuse of discretion. The Court stated: "It is well settled that a trial judge who encounters a matter that falls within the realm of judicial discretion *must* exercise his or her discretion in ruling on the matter....That exercise of discretion must be clear from the record." (Citations omitted; emphasis in original.) Although the trial judge in Jancy's case ultimately refused to give "the non-pattern instructions," he did not reject out of hand the request for such instructions, but rather listened to argument of counsel and considered the requests overnight before ruling that the court was not going to give the requested instructions. Consequently, in contrast to *Gunning, supra,* 347 Md. at 351, 701 A.2d 374, it appears that the denial in this case was based upon the exercise of judicial discretion rather than the rote application of a predetermined uniform policy of never giving non-pattern instructions.

merely a subset of a much broader problem borne out by recent revelations of defendants wrongly convicted.

I expressed my concern, in *Smith,* that there was a substantial body of empirical study suggesting that cross racial identification, particular by whites of blacks, is more difficult than identification of a person within one's own race. Further, expressing the view that cross racial identification is but a subset of a more universal problem, *i.e.,* the unreliability of eyewitness identification, generally, I observed that the problem was exacerbated by the stress of the critical moment to observe, particularly when that moment is short. When the witness is called upon to distinguish features unfamiliar to him or her, the identification, I said, is made more difficult.

The thorough and luminous research[4] provided by Judge Battaglia, in *Smith,* 388 Md. 468, 880 A.2d 288 (2005), rein-

---

4. Only three published field studies have investigated the cross-race effect. *See* Sporer, *supra,* 7 Psychol. Pub. Pol'y & Law at 176. In one field study, black and white subjects posing as customers visited a series of convenience stores browsing for a few minutes and then went to the register to pay. *See* John C. Brigham *et al., Accuracy of Eyewitness Identifications in a Field Setting,* 42 J. Personality & Soc. Psychology 673, 681 (1982). Researchers would then ask the convenience store clerks, some black and others white, to identify the "customers" from a photo array. *Id.* The study found some evidence of the cross-race effect in white clerks identifying black customers. *Id.* According to the study, the overall accuracy rate for all participants was only 34.2%, with black participants being more accurate 69.2% than whites 39.9%. *Id.* Specifically, white clerks misidentified white customers 34.9% of the time and misidentified black customers 54.8% of the time. *Id.*

A second field study conducted in 1988 was modeled after the Brigham study and included Hispanic participants in addition to black and white clerks and customers. *See* Stephanie J. Platz & Harmon M. Hosch, *Cross–Racial/Ethnic Eyewitness Identification: A Field Study,* 18 J. Applied Soc. Psychology 972, 977–78 (1988). Overall, the study found evidence of the cross-race effect. *Id.* White clerks correctly identified white customers 53.2% of the time, which was significantly higher as compared to the identification of black (40.4%) or Hispanic (34.0%) customers. The sample of black participants was too small to reveal any statistically significant evidence of own-race bias. *Id.*

Most recently, researchers conducted a field study in South Africa and England in which black and white participants were asked to view individuals (also black and white) in a lineup and then were asked to identify photos of individuals from the lineup. *See* Daniel Wright, Catherine Boyd & Colin Tredoux, *Eyewitness Identification, A Field*

forces my view that eyewitness identification, generally, has been elevated to an unwarranted degree of certitude in determining criminal agency.

I agree with the majority that the Court of Appeals, because it decided the appeal on the issue of closing argument in *Smith*, 388 Md. at 475, 880 A.2d 288, obviates the necessity to address the propriety of giving jury instructions. I depart, however, with the majority in its view that the "candid" admission of Zaheer Akhtar that he "was not good at identifying African–Americans" tended to make less important the imprimatur of judicial condonation.

Notwithstanding that the Court declined to address the issue of instructions on cross-racial identification, one of the principal bases upon which the court decided there was the right to present the issue in closing argument is instructive: "The case *sub judice* involves the victim's eyewitness cross-racial identification of the defendants, ***which was the sole piece of significant evidence.***" *Id.* at 488, 880 A.2d 288. I concur with the majority in this case, primarily because the conviction was not based solely on the eyewitness identification. But, until such time as the Court of Appeals speaks to the issue, in the rare case where there is a confluence of the

---

*Study of Own–Race Bias in South Africa and England,* 7 Psychol. Pub. Pol'y & Law 119 (2001). The researchers found a cross-race effect in both black and white participants; however, other researchers have noted that the study's findings are difficult to compare to previous studies because of the procedures used to compile the data. *See* Sporer, *supra,* 7 Psychol. Pub. Pol'y & Law at 177.

Overall, there is strong consensus among researchers conducting both laboratory and field studies on cross-racial identification that some witnesses are more likely to misidentify members of other races than their own. *See* Wells & Olson, *supra,* 7 Psychol. Pub. Pol'y & Law at 230 (stating that "it is reasonable to conclude that there is internal validity to the studies showing the other-race effect"). Although many scientists and researchers conducting these studies agree that some witnesses exhibit own-race bias, they disagree on the extent to which such bias affects eyewitness identification due to the variations in the statistical data showing a cross-race effect. *See* Sporer, *supra,* 7 Psychol. Pub. Pol'y & Law at 177; Deborah Bartolomey, *Cross–Racial Identification Testimony and What Not To Do About It,* 7 Psychol. Pub. Pol'y & Law 247, 249 (March 2001).

*Smith,* 388 Md. at 481–83, 880 A.2d 288.

difficulty in identifying persons of another race and where the eyewitness identification is the only evidence of criminal agency, I believe an instruction, as well as leave to present closing argument on the issue, is appropriate.