*Tshibangu Kazadi v. State of Maryland*, No. 779, September Term 2017.  Opinion by
Thieme, Raymond G., Jr., J. (Senior Judge, Specially Assigned).


**DISCOVERY – MD. RULE 4-263(d)(6)(A) -- WITNESSES – MOTION TO
COMPEL PRODUCTION OF IMMIGRATION-RELATED INFORMATION
AND DOCUMENTS AS IMPEACHMENT EVIDENCE.**  The motion court did not
err or abuse its discretion in denying a defense motion to compel disclosure of
information and documents regarding the immigration status of a prosecution witness,
where there was no evidence of a "quid pro quo" or other agreement under which the
witness or her minor son obtained or expected an immigration benefit for identifying the
defendant as the person who shot the victim.


**CROSS-EXAMINATION – WITNESSES – PROTECTIVE ORDER
PROHIBITING IMPEACHMENT BASED ON IMMIGRATION STATUS OF
PROSECUTION WITNESSES.**  The trial court did not err or abuse its discretion in
granting the State's motion to preclude the defense from cross-examining prosecution
witnesses about their immigration status and a pending deportation order, where neither
witness was a suspect in the crime for which the defendant was on trial and there was no
promise or benefit extended by the State concerning immigration.

Circuit Court for Baltimore City
Case No. 116042016

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 779

September Term, 2017

_____

TSHIBANGU KAZADI

v.

STATE OF MARYLAND

_____

Graeff,
Beachley
Thieme, Raymond G., Jr.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Thieme, J.

_____

Filed: February 4, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On the evening of August 18, 2015, in an alley behind the 200 block of North Conkling Street in Baltimore, twenty-one-year-old Brandon Smith was fatally shot. The State tried appellant Tshibangu Kazadi, a resident of that street, for Mr. Smith's murder. Critical to that prosecution was eyewitness testimony by two of appellant's next-door neighbors – a mother and her minor son, whose immigration statuses were the subject of discovery and cross-examination rulings that are challenged in this appeal. After both witnesses identified appellant as the killer, a jury in the Circuit Court for Baltimore City convicted appellant of second degree murder and using a firearm in a crime of violence. Appellant was sentenced for the murder to thirty years, with all but twenty-five years suspended, consecutive to fifteen years for the weapon offense, the first five of that served without parole, for a total executed time of forty years.

Appellant challenges his convictions on three grounds, which we have re-ordered chronologically as follows:

1. Did the circuit court abuse its discretion in refusing to propound Mr. Kazadi's requested voir dire questions?

2. Did the circuit court abuse its discretion in denying defense counsel's motion to compel discovery and, thereafter, in refusing to allow defense counsel to question the State's two main witnesses regarding their immigration issues?

3. Did the circuit court abuse its discretion in refusing to propound defense counsel's proposed jury instruction on eyewitness identification?

Concluding there was no error or abuse of discretion, we shall affirm appellant's convictions. In doing so, we address the limited circumstances in which a criminal

defendant is entitled to discovery and cross-examination regarding the immigration status of prosecution witnesses.

## FACTS AND LEGAL PROCEEDINGS

On August 18, 2015, fifteen-year-old M.L. and his mother S.L.H. had been living in their family home at 208 North Conkling Street, next door to appellant, for more than two years.[1] That evening, S.L.H. asked M.L. to retrieve garbage cans from the alley behind their house. While M.L. was doing so, Brandon Smith was shot three times.

Although M.L. saw appellant fire at the victim, and both he and S.L.H. saw appellant running from the scene with a handgun, they did not tell police until months later. On January 19, 2016, M.L. and his mother, "afraid of what could happen," told police what they witnessed. Both made photo identifications of appellant as the person who shot Mr. Smith and ran from the scene.

Before trial, the parties litigated disputes over whether the State was required to disclose information and documents pertaining to the immigration status of M.L. and S.L.H. and whether defense counsel could cross-examine both witnesses about immigration matters, including a deportation order that S.L.H. mentioned to police. (See our discussion *infra*, in Part II.) As detailed in our discussion, the circuit court denied appellant's motion to compel discovery and foreclosed cross-examination regarding the immigration status of both witnesses.

---

[1] We shall refer to these witnesses by their initials, given their testimony against appellant and the allegations regarding their immigration status.

At trial, M.L. testified that as he was on his back deck that August evening, he heard a gunshot and looked into the alley. He saw appellant fire a handgun at the victim two or three times. When his mother came to the back door, they both saw appellant run into the back of his house, still carrying a gun in his hand.

S.L.H. recounted that while M.L. was out back collecting their trash cans, she heard gunfire. Stepping out her back door, she saw her son running toward her, saying "that the guy had killed someone." S.L.H. saw appellant "running" and "hiding his weapon," as he fled into his basement with a handgun.

Outside, S.L.H. found a "kid" she did not know, who was "agonizing" with three gunshot wounds. Her scream drew others. S.L.H. and M.L. told members of appellant's family what they had seen, but they did not tell police or other emergency responders, because S.L.H. "was scared" after appellant's family "realized that [they] had said that [appellant] was the one that had killed him."

S.L.H. and M.L. waited five months, until January 19, 2016, to disclose to police what they saw. After the trial court foreclosed mention of their immigration status, S.L.H. testified that she did not come forward earlier because she was scared of both "[appellant] or his family" and "something else" that was "not connected to [appellant] or his family."

Her disclosure to police occurred after she revealed information to her sons' doctor, who put her in contact with a social worker in the State's Attorney's Office. S.L.H. and M.L. separately met with police, reported what they observed on the night of the shooting, and identified appellant in photo arrays as the person who shot Brandon Smith.

We shall add pertinent facts in our discussion of the issues raised by appellant.

3

# DISCUSSION

## I.  Voir Dire of Prospective Jurors

Appellant contends that the trial court abused its discretion in denying his request for voir dire questions asking whether prospective jurors would comply with the reasonable doubt standard, the presumption of innocence, and the right not to testify.  We agree with the State that the court correctly followed Court of Appeals precedent and did not abuse its discretion in declining to ask about prospective jurors' "willingness to follow points of law covered in the court's jury instructions."

## A. Trial Record

Defense counsel's written request for voir dire questions included the following queries:

> 17.  The Court will instruct you that the State has the burden of proving the Defendant guilty of the offenses charged beyond a reasonable doubt.  Are there any of you who would be unable to follow and apply the Court's instructions on reasonable doubt in this case?

> 18. Is there any member of the prospective jury panel who would hesitate to render a verdict of not guilty if you had a hunch that the Defendant had committed the alleged crime, but were not convinced of that fact beyond a reasonable doubt?

> 19. The Court will instruct you that the Defendant is presumed to be innocent of the offenses charged throughout the trial unless and until the Defendant is proven guilty beyond a reasonable doubt.  Is there any member of the jury panel who would be unable to give the Defendant the benefit of the presumption of innocence?

> 20. Under the law the Defendant has an absolute right to remain silent and to refuse to testify.  No adverse inference or inference of guilty may be drawn from the refusal to testify.  Does any prospective juror believe that the Defendant has a duty or responsibility to testify or that the Defendant must be guilty merely because the Defendant may refuse to testify?

4

The trial court declined to include these questions in its voir dire, ruling that the legal principles addressed in them would be "covered adequately in the instruction portion of the case" and by "other questions" that it planned to ask. Instead, the court used questions taken from the pattern voir dire approved for criminal trials. *See* Maryland State Bar Ass'n, *Model Jury Selection Questions for Criminal Trials*, http://www.msba.org/uploadedFiles/MSBA/Member_Groups/Committees/Publications/Criminal%20Voir%20Dire%20Model%20Questions%20(2).pdf [https://perma.cc/D5LY-AZ6B] (last visited December 10, 2018).

## B. Standards Governing Voir Dire of Prospective Jurors

"Voir dire is critical to assure that the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantees to a fair and impartial jury will be honored." *Stewart v. State*, 399 Md. 146, 158 (2007). Under Maryland law, "the sole purpose of voir dire is to ensure a fair and impartial jury by determining the existence of cause for disqualification, and not as in many other states, to include the intelligent exercise of peremptory challenges." *Collins v. State*, 452 Md. 614, 622 (2017) (citation and quotation marks omitted). Although trial courts have "significant latitude in the process of conducting voir dire and the scope and form of questions presented to the venire[,]" we are mindful that

> [u]ndergirding the voir dire procedure and, hence, informing the trial court's exercise of discretion regarding the conduct of the voir dire, is a single, primary, and overriding principle or purpose: to ascertain the existence of cause for disqualification. [W]e do not require perfection in its exercise. The trial court reaches the limits of its discretion only when the voir dire method employed by the court fails to probe juror biases effectively.

5

*Id*. at 622-23 (citations and quotation marks omitted).

Appellate courts "review a judge's conduct of voir dire for abuse of discretion and, when a judge's approach provides reasonable assurance that prejudice will be discovered, the judge has acted within his or her discretion." *Id*. at 628. The Court of Appeals has held that, to accomplish that objective,

> certain substantive elements [must] be incorporated. If relevant to the case and requested by one of the parties, we have held that it is reversible error for a trial court not to question the venire regarding racial, ethnic, cultural or religious bias; whether more or less credence would be given to a police officer simply because of that officer's position; and whether the venire harbors an unwillingness to convict a defendant of a capital crime. Yet, even for these mandatory subjects of inquiry, generally, neither a specific form of question nor procedure is required.

*Id*. at 624 (citations, quotation marks, and footnote omitted).

Long ago, in *Twining v. State*, 234 Md. 97, 100 (1964), the Court of Appeals decided that a trial court does not abuse its discretion by refusing to ask whether prospective jurors "would give the accused the benefit of the presumption of innocence and the burden of proof." The *Twining* Court stated that "[i]t is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law." *Id*.

## C. Appellant's Challenge

Acknowledging that his voir dire challenge is foreclosed under *Twining*, appellant tests that precedent, arguing that

> [i]n the fifty-three years since *Twining* was decided, . . . two advances in the law have made the opinion an artifact of its time: First, *Twining* is simply inconsistent with subsequent Court of Appeals decisions that emphasize that "it is the venire person's state of mind, in particular, whether there is some

6

bias, prejudice, or preconception, that is the proper focus of voir dire." Accordingly, these decisions recognize a defendant's right to a voir dire question if the area of inquiry "entail[s] potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them." [*State v. Thomas*, 369 Md. 202, 211-12 (2002)]. Second, the holding in *Twining* rests on the premise that the court's instructions to the jury on the law, including instructions on the presumption of innocence and the burden of proof, are "only advisory." [*Twining*,] 234 Md. at 100. Since 1964, when *Twining* was decided, the Court has made clear that jury instructions are not advisory only.

In support of the latter point, appellant cites *Stevenson v. State*, 289 Md. 167, 188 (1980), and *Montgomery v. State*, 292 Md. 84, 91 (1981), which hold "that instructions on the presumption of innocence and burden of proof are 'binding' on the jury and are 'not advisory.'" *See also Unger v. State*, 427 Md. 383, 411 (2012) ("the *Stevenson* and *Montgomery* opinions set forth a new interpretation of Article 23 and established a new state constitutional standard"). Appellant maintains that, because the trial court must excuse for cause "[p]rospective jurors who would be unable to apply the presumption of innocence and proof beyond a reasonable doubt standards, and jurors who believe that a defendant has a duty or responsibility to testify and that if he refuses to testify he must be guilty," the trial court's "refusal to ask defense Questions 17 through 20" denied him "the opportunity to discover and challenge such jurors for cause."

We conclude that *Twining* is still controlling. Contrary to appellant's contention, the Court of Appeals has affirmed the continuing vitality of *Twining* in decisions issued long after *Montgomery* and *Stevenson*. For example, twenty-five years after jury instructions were declared binding in *Montgomery*, the Court, in *State v. Logan*, 394 Md.

7

378, 398-99 (2006) (some internal citations omitted), invoked *Twining* in holding that a voir dire question proposed by the defense

> was not a proper voir dire question because it asked prospective jurors whether they would apply the rules of law as instructed by the trial court. We agree that Question 7a amounts to a solicitation of whether prospective jurors would follow the court's instructions on the law. This practice is generally disfavored in Maryland, and we find no abuse of discretion on this point. *See Twining v. State*, 234 Md. 97, 100 (1964) (stating it is "generally recognized that it is inappropriate . . . to question the jury as to whether or not they would be disposed to follow or apply stated rules of law").

Similarly, in *Stewart v. State*, 399 Md. 146, 162-63 (2007), the Court continued to follow the policy and practice established in *Twining*, stating that, "[a]s we noted in *Logan*, questions asking whether prospective jurors would follow the court's instructions on the law are disfavored in Maryland and a court does not abuse its discretion in refusing to ask them."

The Court of Appeals mandate on this question is clear. Consequently, any challenge to such binding precedent must be pursued in that Court. We do not address the out-of-state cases cited by appellant for the proposition "that a defendant has a right to voir dire questioning aimed at identifying prospective jurors who are unable or unwilling to apply the presumption of innocence."[2] Even if the Court of Appeals had not foreclosed

---

[2] *Compare Jones v. Florida*, 378 So. 2d 797, 798 (Fla. Dist. Ct. App. 1979) ("counsel must be permitted to inquire of prospective jurors concerning their willingness and ability to accept the court's charge in a criminal case concerning the presumption of innocence, the state's burden of proof in respect to each element of the offense charged, and the defendant's right not to testify, if the court has not first thoroughly examined the prospective jurors on those subjects"); *Illinois v. Zehr*, 469 N.E.2d 1062, 1064 (Ill. 1984) (trial court's refusal to voir dire about the presumption of innocence, burden of proof, and right not to testify "resulted in prejudicial error" because "[i]f a juror has a prejudice against

(continued)

8

consideration of such extra-jurisdictional decisions, they are inapposite to the extent those jurisdictions do not share Maryland's limitations on the scope of voir dire.

## II. Immigration Issues

Appellant next argues that "the [trial] court abused its discretion in denying defense counsel's motion to compel discovery and, thereafter, in refusing to allow defense counsel to question the State's two main witnesses regarding their immigration issues." In his view, "[t]he court's denial of the motion to compel discovery regarding the [witnesses'] immigrations issues and deportation order and the foreclosure of cross-examination on these issues combined to deprive [appellant] of his right to confrontation guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights."

After reviewing the relevant record, we shall address the discovery and cross-examination rulings in turn, explaining why neither warrants appellate relief.

---

any of these basic guarantees, an instruction given at the end of the trial will have little curative effect"); *New Hampshire v. Cere*, 480 A.2d 195, 198 (N.H. 1984) (citing national survey revealing that 50% of respondents believed that the accused was required to prove his or her innocence as grounds for mandating voir dire about accepting and applying the court's instructions on the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt); *New Jersey v. Lumumba*, 601 A.2d 1178, 1188-89 (Super. Ct. App. Div. 1992) (court erred in refusing to ask during voir dire whether prospective jurors understood presumption of innocence).

9

## A. Relevant Record

Before trial, appellant moved to compel the State to disclose information regarding the immigration status of S.L.H. In support, defense counsel proffered that in her statement to police, S.L.H. said "that she was hesitant to come forward with information because she was worried about an outstanding deportation order." Defense counsel asked the court to order the State to disclose information regarding S.L.H.'s immigration status, including her Alien Number ("A Number") and a copy of any deportation order, on the ground that testifying in the criminal case would make S.L.H. and her minor son, M.L., "eligible for relief from the deportation order." In addition, counsel argued that both witnesses' "efforts to avoid compliance with the deportation order involved conduct that reflects upon a character for untruthfulness 'under [Md.] Rule 5-608.'"

The State opposed the motion, arguing that S.L.H.'s immigration status was "neither relevant nor discoverable," under *Brady v. Maryland*, 373 U.S. 83 (1963), and Md. Rule 4-263, which require disclosure of impeachment material, including "the witness's prior conduct that would show untruthful character pursuant to [Md.] Rule 5-608(b)" and "any relationship between the State and the witness that may constitute an inducement to cooperate or testify on behalf of the State." The prosecutor maintained that no disclosure was required because "the State has not represented to [S.L.H.] that she would receive special treatment for her cooperation in this case." Moreover, the prosecutor continued, "defense counsel has proffered no evidence to show that [S.L.H.] is actively attempting to evade her outstanding deportation order[,]" and "speculation should not serve as a basis for a fishing expedition into the immigration status of a witness." Accompanying its response,

10

the State proffered an executive order from the Mayor of Baltimore, "encourag[ing] any and all residents of Baltimore to report crimes to law enforcement, regardless of race, ethnicity, or immigration status."

The State also moved *in limine* to restrict cross-examination of S.L.H. and M.L., citing case law that "[i]mmigration status alone does not reflect upon an individual's character and is thus not admissible for impeachment purposes." *Ayala v. Lee*, 215 Md. App. 457, 480 (2013). The State distinguished S.L.H. from the witnesses who were subject to cross-examination in *Carrero-Vasquez v. State*, 210 Md. App. 504 (2013), and *United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004), on the ground that she "has no connection to the crimes," no special immigration status based on a relationship with the government, and no other motive to testify falsely. Nor had she been "promised or induced . . . to provide any information that she has already given, or which may be elicited during trial testimony."

In a memorandum opinion, the motion court denied appellant's discovery request, reasoning that

> [u]nlike *United States v. Blanco*, where the witness at issue was a paid federal informant who had been granted special immigration status based on his cooperation with the government, [appellant] does not identify any specific promise or inducement extended by the State to either witness in connection with the witness's immigration status. *See Briggs v. Hedgpeth*, 2013 WL 245190 at *6-10 (N.D. Cal. Jan. 22, 2013) (denying *habeas* relief based on alleged *Brady* violation despite certain statements made to victim by police that they could help him with immigration matter). [Appellant] apparently simply wants to confirm the information stated by [S.L.H.], with some hope that it might be developed into a credibility issue. The only case cited by [appellant], *Carrero-Vasquez v. State*, did not involve any discovery issue. *Without a showing by* [*appellant*] *of some special relationship between the witness and the State relating to immigration or some promise or inducement*

11

*or benefit extended by the State concerning immigration,* [*appellant*] *has failed to show a basis to compel any further disclosure.*

(Emphasis added; some citations omitted.)

The motion court reserved the ruling on the State's motion *in limine*, for decision by the trial court. At a suppression hearing conducted on the eve of trial, S.L.H. explained that she waited to tell police that she saw appellant run from the alley with a gun in hand, because she was afraid of appellant, who was living next door, and of "the weapons that they had in there." Outside the presence of the jury, S.L.H. explained that after disclosing to appellant's family members that she saw appellant at the murder scene, she believed "[t]he life of [her] family was in danger." Afterward, appellant and his friends "would be in front of [her] house," staying there whenever she opened the door. They warned that she "should not be outside with [her] sons" because "something could happen."

After she and M.L. identified appellant to police, the family received relocation assistance, which included payment of rent. But S.L.H. did not receive or ask for any other benefits. Nor did she expect any benefits for testifying.

The trial court accepted that testimony, pointing out that it had "not heard anything from this family indicating to me that there is an immigration issue that would have been a factor in them testifying." The court also expressed "significant concern" about "how this jury's going to react[,]" pointing out that

> there is some level of hostility in some circles in our society to people who are perceived as being here illegally. Whether that is valid or not valid, I don't want to be in a situation where we prejudice a jury by raising an issue which may not be germane to the case. Obviously if it is germane to the case, if they've been promised to stay in the U.S. indefinitely . . . in exchange for

12

testimony[,] that obviously is a very valid factor and in which case the prejudice is something that would not be outweighed.

When the court pressed defense counsel for any "indication . . . that there's a quid pro quo for immigration status[,]" defense counsel responded:

[DEFENSE COUNSEL]: Well, I would argue that one of the reasons she decided to come forward was because she was informed apparently by the social worker that the police wouldn't enforce the deportation order. And I think non-enforcement of a deportation order is a benefit.

[PROSECUTOR]: We've heard no testimony to that effect.

THE COURT: I haven't heard any testimony to that. Who is the social worker, by the way?

[DEFENSE COUNSEL]: It's the one from the doctor.

THE COURT: Well, that's not official conduct. . . .

Now, there is Evelyn, who I take it is a member of the [State's Attorney's] staff . . . .

And so the question is, did the State's Attorney's Office provide her quid pro quo. Now in federal court they have these . . . detailed contracts that . . . you can put into the record and I don't know that the State's – I've never seen one –

[PROSECUTOR]: No.

THE COURT: -- that the State's Attorney's Office has. And if she were placed in a new house and the new house was . . . some mansion in Ruxton or something, that's one thing. I kind of suspect that's not what she got. . . . [U]nless you have something more concrete about her immigration status I am really concerned about putting into the record possibly that this lady is an illegal immigrant – an undocumented alien . . . or that her son is given the fact that there is, as I say, among circles in our society a strong bias, prejudice, in fact, . . . against people who are undocumented aliens. . . . [I]t's legitimate to pursue areas of legitimate inquiry on cross examination. . . . But by the same token I don't want to get into areas that I think are going to shed more heat than light. This is one. So unless you can make a proffer to me, let's say tomorrow when she comes on to testify that you've got something

13

that would constitute . . . a quid pro quo on the immigration status[,] I'm uncomfortable with letting that in.

The trial court also rejected defense counsel's contention that failing to comply with a deportation order was impeachable "evidence of deceit" because it was "analogous to the way that the Court of Appeals has said drug dealers necessarily are surreptitious[.]" The court explained that it did not "buy the notion that a family who comes to America to try to make something of themselves and get their kids in school is equivalent to a drug dealer." Ruling that "we're not going to do an immigration trial here in this court as part of this criminal case[,]" the court explained that "this is one of those circumstances in which the equities I think really militate against allowing that particular thing to become an issue in the case." Unless defense counsel could "come up with something that makes it more than a speculation that there's a quid pro quo," presented "out of the hearing of the jury[,] . . . it would be unfairly prejudicial to the witness."

Defense counsel, attempting to keep the door open, pointed out that he had been unable to conduct any search for evidence relating to S.L.H. because the prosecutor "thwarted" his efforts to obtain the "immigration A number" by which all immigration information must be accessed. When the court asked the prosecutor why, she responded:

> [PROSECUTOR]: I don't have the information, Your Honor, and obviously Baltimore is a sanctuary city. . . . As a City employee I don't think it's my job to inquire into her immigration status. I have never asked her what it is. . . . Again, there's been no relationship here between the State or any government agency saying, if you come in and you testify then . . . we're going to make you a United States citizen. . . . These are just folks who had the unfortunate luck of living next door to somebody . . . who killed someone.

14

The trial court granted the State's motion *in limine*, subject to reconsideration if defense counsel "discover[s] something that is relevant and that is concrete[.]"

The next day, after S.L.H. completed her direct examination, the prosecutor noted that "no additional evidence has been presented . . . with regards to the immigration issue[.]" Defense counsel disagreed, arguing "quite the opposite" based on S.L.H.'s testimony that she did not come forward initially because she was afraid of appellant. Counsel maintained her trial testimony was inconsistent with her recorded statement to police that she was afraid to come forward because of the deportation order. Defense counsel argued that this was an impeachable inconsistency regarding her "motivation for not coming forward."

The trial court denied defense counsel's request to impeach S.L.H. with her statement that she did not come forward earlier because she was afraid of being deported, because that was not necessarily inconsistent with her testimony that she also was afraid of appellant. In turn, because defense counsel still had not proffered any evidence that S.L.H. received an immigration benefit in return for her testimony, and her immigration status was not probative of credibility, the court restricted defense counsel to asking whether she had given police an "inconsistent reason" for not coming forward.

On cross-examination, defense counsel asked S.L.H. about her statement to police:

[DEFENSE COUNSEL]: Now, the police, when you talked to them in January, they asked you why you didn't come forward initially.

[S.L.H.]: Because I was scared.

[DEFENSE COUNSEL]: Okay. And I'm going to ask you this question very carefully. But at the time you didn't tell the police that you were scared of

15

Mr. Kazadi or his family, you told them you were scared of something else, correct?

[S.L.H.]: Yes.

[DEFENSE COUNSEL]: Okay. And that is something not connected to Mr. Kazadi or his family?

[S.L.H]: Can you repeat the question please?

[DEFENSE COUNSEL]: Sure. The other thing that you're scared of is not connected to Mr. Kazadi or his family?

[S.L.H.]: I said – I said both. I said why I was worried.

When defense counsel refreshed her recollection with a transcript of her recorded interview with police, S.L.H. responded: "I repeat again, I spoke about both. I was afraid of his family and something else."

After concluding his cross-examination of S.L.H., defense counsel proffered for the record that he would have asked her about her immigration status, including questions about the deportation order. Likewise, during M.L.'s cross-examination, defense counsel proffered that, but for the prior ruling, he would have asked immigration-related questions. The court reiterated that "the questions are ruled out as far as the immigration question."

## B. The Parties' Contentions

Appellant contends that the "court abused its discretion in denying defense counsel's written motion to compel the State to produce [S.L.H.'s] Alien Number and a copy of the deportation order[,]" because "[d]efense counsel had an obligation to investigate the credibility of the two eyewitnesses who testified that Mr. Kazadi shot another man in the alley behind their house." In his view, he established "a good faith

16

basis to believe that the requested discovery materials would reveal information relevant to the credibility of [S.L.H.] and her son."  Once S.L.H. "stated to police that she had an outstanding deportation order[,]" appellant maintains, such "information was discoverable" under Md. Rule 4-263, because "a number of courts have concluded that unlawful entry into the United States, the commission of an immigration-related offense, and false representations made in an effort to get into or remain in the United States reflect on credibility."[3]

Linking his disclosure and confrontation complaints, appellant also argues that the court's discovery ruling "placed [defense counsel] in an impossible situation[,]" because

---

[3] Appellant cites a number of extra-jurisdictional cases as support for the proposition that "evidence of unlawful entry . . . or the violation of immigration law, not just one's status as an illegal immigrant, is admissible as relevant to a witness's truthfulness."  Yet not all those decisions support that thesis, and most pertain to impeachment of the defendant rather than a prosecution witness. *Compare United States v. Almeida-Perez*, 549 F.3d 1162, 1174 (8th Cir. 2008) ("the use of such evidence is fraught with the danger of prejudice to a defendant by introducing the possibility of invidious discrimination on the basis of alienage"); *with United States v. Cardales*, 168 F.3d 548, 557 (1st Cir. 1999) (defendant's "unlawful entry into Puerto Rico was relevant to show [his] character for truthfulness, and was therefore admissible to impeach [him] on cross-examination"); *United States v. Cambindo Valencia*, 609 F.2d 603, 634 (2nd Cir. 1979) (evidence of defendant's immigration violation was properly admitted as evidence bearing on his credibility); *Marquez v. Wyoming*, 941 P.2d 22, 26 (Wyo. 1997) (trial court had discretion to allow "testimony about [defendant's] illegal alien status and his use of a false social security number . . . for purposes of impeachment" because it "was probative of [his] character for truthfulness").  *Cf. Illinois v. Austin*, 463 N.E.2d 444, 452 (Ill. App. Ct. 1984) (recognizing that "an illegal alien, like a probationer, might be vulnerable to pressure, real or imagined, from the authorities"); *Arroyo v. Texas*, 259 S.W.3d 831, 835 (Tex. Ct. App. 2008) (no evidence of cooperation of witness with law enforcement in exchange for immigration assistance); *New Mexico v. Huerta-Castro*, 390 P.3d 185, 198-99 (N.M. Ct. App. 2016) (application for U-Visa allowing mother to remain in country legally in return for testimony against two accused of sexually assaulting her children was impeachment evidence that showed possible motive for fabricating charges).

"[h]e was not able to discover the basis for the deportation order, which very well may have been relevant to the witness's credibility[,]" perhaps revealing "evidence of illegal entry or use of falsehoods to enter or remain in the country." According to appellant, "[t]he trial judge exacerbated the problem by refusing to permit defense counsel to ask the witnesses any questions whatsoever about their immigration issues, particularly the deportation order and whether they expected any immigration benefit in return for testifying for the State."

The State counters that the circuit court properly exercised its discretion in limiting both discovery and cross-examination, because

> [t]he police statement that formed the basis for the defense's motion to compel establishes only that [S.L.H.] was in the United States illegally, and that she, her two children, and her husband were the subject of a deportation order. This information was not relevant to the witnesses' credibility, and should not, without more, serve as the basis for [a] State-assisted fishing expedition into the immigration records of a witness.

After the State's Attorney "presumably fulfilled" the State's obligation to disclose "prior criminal convictions, pending charges, or probationary status that may be used to impeach the witness," Md. Rule 4-263(d)(6)(C), the State contends that appellant "was not entitled to more simply because the State's witnesses were in the United States illegally." "[F]or similar reasons," the State continues, the court appropriately limited cross-examination on the ground that defense counsel's "proposed inquiry into the witnesses' immigration status lacked probative value" and "posed a substantial danger of unfairly prejudicing the jury against the witnesses."

18

## C. Maryland Law

Maryland Rule 4-263(d)(6)(A), governing the State's discovery obligations in a criminal case, provides that, "[w]ithout the necessity of a request, the State's Attorney shall provide to the defense . . . [a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness, including . . . evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608(b)[.]"

"A criminal defendant's right to confront witnesses is guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights." *Ashton v. State*, 185 Md. App. 607, 621 (2009). *See Pantazes v. State*, 376 Md. 661, 680 (2003). "'Central to that right is the opportunity to cross-examine witnesses.'" *Ashton*, 185 Md. App. at 621 (quoting *Pantazes*, 376 Md. at 680). Yet a defendant's right to cross-examine is not limitless, as judges "have wide latitude to establish reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Pantazes*, 376 Md. at 680. "Thus, the scope of the cross-examination lies largely within the discretion of the trial judge." *Ashton*, 185 Md. App. at 621. "An abuse of discretion occurs when the trial judge imposes limitations on cross-examination that 'inhibit . . . the ability of the defendant to receive a fair trial.'" *Gupta v. State*, 227 Md. App. 718, 745 (2016) (quoting *Pantazes*, 376 Md. at 681-82), *aff'd*, 452 Md. 103, *cert. denied*, 138 S. Ct. 201 (2017).

Implementing these constitutional guarantees, Md. Rule 5-616(a)(4) authorizes impeachment "through questions asked of the witness, including questions that are directed

at . . . [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]" Among the cross-examination tools available to defendants is Md. Rule 5-608(b), authorizing impeachment based on a witness's prior conduct. That rule provides:

> The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

There is no Maryland precedent addressing a criminal defendant's right to discover immigration-related information about prosecution witnesses. Yet two Maryland cases provide some guidance on the right to cross-examine witnesses about immigration matters. We review both as background for our discussion below.

In *Ayala v. Lee*, 215 Md. App. 457, 463-66, 480 (2013), the trial court did not err or abuse its discretion in foreclosing cross-examination of the plaintiffs about immigration-related information, including their illegal status, use of illegally acquired Social Security numbers, and misrepresentation of their immigration status on employment documents. Although this was a personal injury action rather than a criminal case, we observed in that context that "[i]mmigration status alone does not reflect upon an individual's character and is thus not admissible for impeachment purposes." *Id*. at 480 (citing *Figeroa v. U.S. I.N.S.*, 886 F.2d 76, 79 (4th Cir.1989) ("An individual's status as an alien, legal or otherwise, however does not entitle the [government] to brand him a liar."); *Galaviz-Zamora v. Brady Farms, Inc.*, 230 F.R.D. 499, 502 (W.D. Mich. 2005) (finding no connection between

20

immigration status and witness credibility); *Mischalski v. Ford Motor Co.*, 935 F. Supp. 203, 207-08 (E.D.N.Y.1996) (finding no support for "the conclusion that the status of being an illegal alien impugns one's credibility")). Moreover, we recognized that "[i]mmigration violations that involve false statements, such as false employment papers, are more likely to be relevant, but are still subject to an intensive inquiry into the likelihood of prejudice[.]" *Id.* at 481. For that reason, the "relevance of an immigration-related false statement, standing on its own, is limited if the party against whom it is offered is not charged with an immigration-related crime." *Id.*

In *Carrero-Vasquez v. State*, 210 Md. App. 504, 516 (2013), a firearm possession case, the defense sought to establish that a stolen gun found in a borrowed vehicle driven by the defendant belonged to the owner of the vehicle. Because the vehicle owner admitted that "she was both illegally in the United States and aware of the potential deportation consequences if she were convicted of possessing the stolen handgun at issue[,]" this Court concluded that the defense had established a sufficient foundation to justify cross-examining the witness about the consequences of a firearm conviction on her immigration status. *Id.* at 527. This Court held that the trial court erred in foreclosing impeachment cross-examination, reasoning that the witness's immigration status was not "merely a collateral issue, likely to confuse and mislead the jury," but rather "an obvious reason that an important witness for the prosecution might have to testify falsely." *Id.* at 508, 522. In addition, we concluded that "evidence that [the witness] had a motive to testify falsely was not outweighed at all, much less substantially so, by the danger of confusion to the jury or unfair prejudice to the State." *Id.* at 527 (citations and quotations marks omitted).

21

## D. Analytical Framework

Neither *Ayala* nor *Carrero-Vasquez* addresses the questions presented here. Indeed, neither case presents an immigration-related discovery issue, and both present distinguishable confrontation questions. Because *Ayala* is a civil case, that decision does not consider the rights of a criminal defendant to discovery and cross-examination. Moreover, appellant concedes that although *Carrero-Vasquez* is a criminal case, it "is only marginally helpful" because, unlike S.L.H., the prosecution witness in that case had an immigration-related motive to falsely accuse the defendant, in order to protect herself from being convicted on the weapon charge, then deported as a result of that conviction. In contrast, as appellant admits, "there was no suggestion that [S.L.H.] or her son could have been charged with any crime related to the shooting."

Although neither *Ayala* nor *Carrero-Vasquez* controls our decision in this case, we apply two important lessons from those decisions: (1) that the immigration status of a witness generally does not impeach that witness's credibility regarding a non-immigration matter, and (2) that the disclosure of a witness's immigration status may inject unfair prejudice into the case. In our view, these cases teach that immigration-related information about a prosecution witness should not be disclosed, whether to defense counsel in discovery or to the jury during cross-examination, unless such information is sufficiently probative of the witness's credibility in the matter before the court, such as in the case of a witness who receives an immigration-related benefit for testifying or a witness who avoids an immigration-related detriment as a result of such testimony. Even in those

22

circumstances, a court may restrict discovery or cross-examination to avoid unfair prejudice to the witness or the proceedings.

Both the motion court and the trial court concluded that the immigration status of these key prosecution witnesses was not probative of their credibility concerning the murder of Brandon Smith and that cross-examination regarding their immigration-related matters would be unfairly prejudicial. For the reasons that follow, we find no legal error or abuse of discretion in those rulings.

### E. Discovery

The motion court found there was no evidence of a quid pro quo that called into question the credibility of these witnesses regarding what they saw on August 18, 2015. The record supports that determination.

As detailed in our review of the motion record, defense counsel maintained that immigration information concerning S.L.H. and M.L. should be disclosed because those witnesses may have belatedly identified appellant as Brandon Smith's killer in order to protect their family from deportation. The prosecutor counter-proffered that the State had not given S.L.H. or M.L. any immigration-related benefit for identifying appellant or for testifying against him. S.L.H. corroborated that proffer, testifying outside the presence of the jury that the only benefit the family received was relocation assistance. Appellant was permitted to cross-examine her about that assistance.

The State points out that if the prosecutor "had reason to believe that the witness[es] ha[d] a criminal record," she was obligated to disclose any "prior criminal convictions, pending charges, or probationary status that may be used to impeach the witness[.]" *See*

23

Md. Rule 4-263(d)(6)(C). We agree that the fact that no such disclosure was made, either before or at the hearing on appellant's motion to compel, indicates that no such evidence existed.

Similarly, appellant's speculation that S.L.H.'s immigration file could have contained evidence that she made false statements regarding her immigration status is not persuasive. Even if her file contained such evidence, "the relevance of an immigration-related false statement, standing on its own, is limited" when, as in this case, "the party against whom it is offered is not charged with an immigration-related crime." *Ayala*, 215 Md. App. at 481. *See also United States v. Almeida-Perez*, 549 F.3d 1162, 1174 (8th Cir. 2008) ("the relevance of an immigration violation to character for truthfulness is at the least debatable and would depend on the facts of the particular violation since many immigration violations do not involve a false statement").

Absent any evidence of an immigration-related quid pro quo indicating a bias or motive to testify falsely, defense counsel's request for S.L.H.'s "A number" and the deportation order amounted to a fishing expedition for information that would not be admissible to impeach her. With nothing to link the deportation order or the witnesses' immigration status, to either their identification of appellant as Mr. Smith's killer or their trial testimony, the motion court did not err or abuse its discretion in denying the defense motion to compel disclosure of immigration material.

## F. Cross-Examination

In reviewing the trial court's subsequent decision to foreclose cross-examination of both S.L.H. and M.L. about immigration matters, we shall consider analogous standards governing restrictions on impeachment cross-examination regarding pending criminal charges.

> As with any question permitted by Rule 5-616(a)(4) suggesting that a witness is biased or has a motive to testify falsely, there must be a factual foundation for the question. The pending charges are not the impeachment evidence; rather, they are part of the factual predicate for asking the permitted question about bias or motive. But the existence of pending charges alone is not a sufficient predicate for such a question. *There must be some evidence— either direct (e.g., an agreement with the prosecution to resolve charges in return for testimony) or circumstantial (e.g., release of witness from custody, dismissal of charges, a decision to forgo charges, postponement of disposition of a violation of probation charge) that the witness has an expectation of benefitting from the testimony* with respect to the pending charges. The factual predicate for the question becomes attenuated when the charges are pending in another jurisdiction, particularly another state, or arose after the witness had provided the prosecution with the same information as contained in his testimony.
>
> Even if there is a factual foundation to ask a witness about the witness's expectation of a benefit with respect to pending charges, a trial court may limit such questioning if the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion.

*Peterson v. State*, 444 Md. 105, 135-36 (2015) (emphasis added; citations, quotation marks, and footnotes omitted).

Other jurisdictions have applied substantially similar standards in limiting cross-examination regarding immigration information. *See, e.g., Connecticut v. Jordan*, 44 A.3d 794, 815 (Conn. 2012) ("the fact of noncitizenship, standing alone, does not reasonably suggest that a witness will lie. Rather, there must be some demonstrated link between a

25

witness' immigration status and his or her propensity to testify falsely"); *Arroyo v. Texas*, 259 S.W.3d 831, 836 (Tex. Ct. App. 2008) (trial court did not abuse its discretion by precluding cross-examination about immigration status in the absence of evidence that witness received a benefit).

We find a recent decision by the Georgia Supreme Court in *Lucas v. Georgia*, 810 S.E.2d 490 (Ga. 2018), instructive here. In that case, a trial court foreclosed cross-examination about the immigration status of A.L., a key prosecution witness. Rejecting Confrontation Clause complaints comparable to those made by appellant, the appellate court reasoned:

> Before the trial court disallowed that line of cross-examination, it permitted Lucas to examine A.L. outside the presence of the jury. In the course of that examination, A.L. conceded that he was generally concerned about the prospect of deportation. But without more, such a generalized concern does not provide much reason to think that A.L. had cause to shade his testimony in favor of the prosecution. In the first place, the State of Georgia—the prosecution in this case—has no power to deport a person unlawfully present in the United States. Deportation is a matter reserved to the United States. Although we do not doubt that some aliens may not appreciate the distinction between our federal and state governments, nothing in the record suggests that A.L. misapprehended that the prosecuting attorneys or investigating law enforcement officers with whom he dealt had any power to have him deported or to otherwise affect his immigration status. Indeed, about that subject, A.L. said: "I don't know if this has anything to do with immigration or not."
>
> A.L. was asked whether he was concerned that, if he did not cooperate with the prosecution, "they might call immigration," and he said that he was not. There is nothing to suggest that anyone associated with the prosecution threatened or intimated anything to A.L. about deportation, that anyone promised to help A.L. with his immigration status, or that A.L. had a subjective belief that cooperating with the prosecution would somehow benefit him with respect to his status. When A.L. was asked whether greater cooperation with law enforcement made it less likely that they would contact federal immigration authorities about him, he said: "Well, I don't know that."

The notion that A.L. was influenced in any way with respect to his testimony by his immigration status is simply speculative, and evidence of his immigration status – if relevant at all to his bias and partiality – had very little probative value. *See Olds v. State*, 299 Ga. 65, 75 [], 786 S.E.2d 633 (2016) ("[T]he greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered." (Citation omitted)). Such evidence, on the other hand, could have impugned his character, and it certainly carried the potential to prejudice jurors against him. *See Sandoval v. State*, 264 Ga. 199, 200 [], 442 S.E.2d 746 (1994). *See also* OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Moreover, the trial court did not prohibit Lucas from cross-examining A.L. generally about bias or partiality towards the prosecution. Lucas was not prevented from asking, for example, whether A.L. hoped to receive any benefit as a result of his testimony. Only his immigration status was off-limits. *See Junior v. State*, 282 Ga. 689, 691 []n.4, 653 S.E.2d 481 (2007) (even assuming that victims' immigration status created a bias analogous to a deal with the State, the defendant was only prohibited from asking about their immigration status; the prohibition "did not encompass any and all questions concerning whether the victims received any benefit in exchange for their testimony"). In these circumstances, the trial court was within its considerable discretion to disallow cross-examination of A.L. about his immigration status. *See . . . Lemons v. State*, 270 Ga. App. 743, 749 [], 608 S.E.2d 15 (2004) (defendant was not entitled to cross-examine victim witnesses about their illegal immigration status where the record showed that the State "made no promises or offers to assist the victims with their immigration status and that the victims had not asked for any assistance in exchange for their testimony").

*Id.* at 494-95 (some citations omitted).

As in *Lucas*, the record here supports the trial court's finding that there was no expected or received benefit. From the initial written pleadings, to the pretrial suppression hearing, to the trial, this record is devoid of any evidence that S.L.H. or M.L. received or expected an immigration-related benefit as a result of either their identification of appellant or their testimony against him. We set forth a detailed summary of those proceedings to

27

show that there was no such testimony or proffer. To the contrary, the prosecutor insisted she had never discussed immigration status with S.L.H. At the suppression hearing before trial, S.L.H. testified that the only benefit she received was relocation expenses, which were not tied to the family's immigration status. She maintained that she did not expect any benefit for coming forward to identify appellant or testify against him. Her trial testimony was consistent on that point.

Absent any link between the witnesses' immigration status and their credibility, the trial court did not abuse its discretion in foreclosing cross-examination of S.L.H. and M.L. about immigration matters. Significantly, the court's ruling only disallowed cross-examination about immigration status, without preventing defense counsel from asking whether S.L.H. hoped to receive any other benefit from her testimony, such as relocation expenses. *See id.* Accordingly, appellant's concern that S.L.H.'s testimony was influenced by her immigration status was "simply speculative, and evidence of [her] immigration status – if relevant at all to [her] bias and partiality – [would have] had very little probative value." *See id.*

As alternative grounds for affirming the trial court's decision to restrict cross-examination, we hold that the trial court did not abuse its discretion in ruling, pursuant to Rule 5-403, that questioning S.L.H. and M.L. about their immigration status and/or the deportation order would unfairly prejudice the jury "by introducing the possibility of invidious discrimination on the basis of alienage." *See United States v. Almeida-Perez*, 549 F.3d 1162, 1174 (8th Cir. 2008); *cf. Salas v. Hi-Tech Erectors*, 230 P.3d 583, 587 (Wash. 2010) (en banc) (probative value of evidence of worker's status as undocumented

28

immigrant, "by itself, is substantially outweighed by the danger of unfair prejudice"). As the trial court emphasized, such evidence had a significant potential both to prejudice jurors against the prosecution witnesses and to confuse jurors by injecting unrelated immigration issues involving mere bystanders into this murder trial against appellant. *See Lucas*, 810 S.E.2d at 494-95.

The "final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge." *Newman v. State*, 236 Md. App. 533, 556 (2018). In the circumstances presented here, the trial court was within its considerable discretion to foreclose cross-examination of S.L.H. and M.L. about their immigration status. *See Lucas*, 810 S.E.2d at 495.

### III.    Jury Instruction on Eyewitness Identification

In his final assignment of error, appellant contends that the trial court "abused its discretion in refusing to propound defense counsel's proposed jury instruction on eyewitness identification." The State counters that the court "properly exercised its discretion by giving the Maryland pattern jury instruction on eyewitness identification instead of a six-page instruction from New Jersey." For the reasons explained below, we agree that the court did not abuse its discretion in giving the Maryland pattern instruction instead of the lengthy excerpt from the New Jersey pattern instruction.

### A.  Trial Record

The six-page instruction requested by defense counsel (and set forth in our appendix) is taken from a ten-page pattern instruction approved for New Jersey courts. Defense counsel argued to the trial court that this instruction was warranted because it

includes language not present in the Maryland pattern instruction, covering concerns about

"human memory," cross-racial identification, and "weapon focus." The trial court denied

appellant's request, explaining

> [T]his instruction, besides being extraordinar[il]y lengthy, takes as givens a whole series of conclusions relating to cognitive science and the like which I think frankly may very well be correct but it's an evolving field and this is . . . carving into stone, scientific conclusions which may or may not prove to . . . be the case in relative to this particular case.
>
> As an example, the cross-racial effect does exist. At least that's pretty much been documented in other research but I don't think it's a factor in this case quite honestly because it was a next door neighbor. It wasn't someone that they had never seen before. It was somebody which there's a high degree of familiarity. So as an example, although there may be cases in which the cross-racial effect would be an appropriate instruction, it's not in the case under the circumstances of this case. So I have considered that. . . .
>
> And I think that this particular instruction strikes me as overkill. It strikes me . . . that here was a gee whiz on the part of the court in New Jersey that they fell in love with a new concept and went overboard in trying to incorporate it within their processes. . . .
>
> The Maryland Pattern Jury Instruction was a result of a great deal of effort on the part of the committees and the Court of Appeals which adopted [them]. It . . . is presumptively correct under Maryland law. I think it represents a significant analysis of the facts and the understanding of the way in which people see and perceive. It does cover the ground I think in a way that is appropriate. . . .
>
> So for all these reasons, . . . I'm not going to be using this instruction which I think . . . is overkill and . . . may go beyond the science and is something that would be confusing to the jury . . . .
>
> I do think that the Maryland instruction, the Pattern Instruction, again, besides being presumptively correct, reflected a lot of serious thought. I think it accurately describes both the law in Maryland and also gives a good description of factors[.]

The court instructed the jury consistently with Maryland Criminal Pattern Jury Instruction 3:30 (MPJI-Cr 3:30), as follows:

> Now the burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defense – excuse me, and that the defendant was the person who committed it.
>
> You've heard evidence about the identification of the defendant as the person who committed the crime. You are to consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and other circumstances surrounding the event.
>
> You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility as well as any other factors surrounding the identification. It is for you to determine the reliability of any identification and give it the weight you believe it deserves.

## B. Standards Governing Jury Instructions on Witness Identification

Upon request, a trial court is required to "instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). "The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." *Id.*

We review a decision not to give a requested jury instruction for abuse of discretion. *See Cost v. State*, 417 Md. 360, 369 (2010). In doing so, we are mindful that "jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate." *Fleming v. State*, 373 Md. 426, 433 (2003). As this Court has advised

31

for the benefit of trial judges generally[,] . . . the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions. Those instructions have been put together by a group of distinguished judges and lawyers who almost amount to a "Who's Who" of the Maryland Bench and Bar. Many of these instructions have been passed upon by our appellate courts.

*Green v. State*, 127 Md. App. 758, 771 (1999).

With respect to instructions about identification evidence specifically, the Court of Appeals has held that

[w]hen uncorroborated eyewitness testimony is a critical element of the State's case and doubts have been raised about the reliability of that testimony, a request for an eyewitness identification instruction should be given careful consideration. Conversely, a request for an eyewitness identification instruction may be rejected when there is corroboration of the defendant's participation in the crime, when the circumstances surrounding the eyewitness identification do not give rise to any reasonable doubts as to its accuracy, or when other instructions contain criteria or guidance that is similar to the requested instruction.

*Gunning v. State*, 347 Md. 332, 354-55 (1997).

### C. Appellant's Challenge

Appellant contends that the trial court should have instructed the jury using the language he excerpted from the New Jersey pattern instruction. In his view, the Maryland pattern instruction is inadequate because it did not specifically address the phenomena of "cross-racial identification, weapon focus and factors to consider in evaluating the reliability of a photographic array." We disagree.

The issue of whether to give an instruction regarding cross-racial identification has been addressed in three reported Maryland cases, none of which has held that the trial court abused its discretion in failing to give such an instruction. In *Smith v. State*, 158 Md. App.

32

673, 704 (2004), *rev'd on other grounds sub nom. Smith and Mack v. State*, 388 Md. 468 (2005), this Court held that a cross-racial identification instruction was not required because the defendant presented no evidence suggesting that the witness "lacked familiarity and contact with persons of [the defendant's] race" or "that race played a part in the identification." Although the Court of Appeals reversed on the ground that the trial court must allow, when relevant, defense closing argument regarding cross-racial identification issues, it did not reach the issue of whether it was an abuse of discretion to deny a cross-racial identification instruction in that instance. *See Smith and Mack*, 388 Md. at 478, 488-89.

Subsequently, in *Janey v. State*, 166 Md. App. 645, 666, *cert. denied*, 392 Md. 725 (2006), this Court held "that the trial judge did not abuse his discretion in refusing to give the requested instruction on cross-racial identification[,]" while cautioning that our decision "should not be interpreted as holding that it is never appropriate to give such an instruction. Nor should the fact that no instruction on cross-racial identification appears yet in the Maryland Criminal Pattern Jury Instructions serve as the basis for an arbitrary refusal to consider granting such an instruction." *Id.* After acknowledging the same New Jersey pattern instruction that appellant contends should have been given here, we concurred with the New Jersey Supreme Court that "an instruction on cross-racial identification 'should be given only when . . . [1] identification is a critical issue in the case, and [2] an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability.'" *Id.* at 664 (quoting *New Jersey v. Cromedy*, 727 A.2d 457, 467 (N.J. 1999)).

33

Writing for this Court, Judge Meredith pointed out that, "[i]n contrast to the judge's duty to instruct the jury as to the applicable law, . . . there is generally no duty for a trial court to give instructions that emphasize particular facts in evidence." *Id*. at 654. Moreover, there may be important reasons to refrain from doing so:

> The underpinning of the Court's ruling in *Smith and Mack* was that it is reversible error for a trial court to prevent a defendant from attacking the prosecution's evidence during closing argument. That holding does not support the conclusion that a trial court commits reversible error if it declines to give the jury an instruction on cross-racial identification.
>
> In this Court's opinion in *Smith*, Judge [James] Eyler highlighted some of the difficult questions that begin to surface when the courts consider imposing a rule requiring instructions regarding factors to consider in witness identification:
>
>> Should an eyewitness identification instruction always include a laundry list of specific factors based on the perceived common knowledge of men and women? When does such an instruction constitute an improper comment on the evidence by the court? More to the point here, if race is to be identified as a factor, should the same be true for ethnicity and other analogous factors? What is the rule for multi-racial persons? How does one determine race? Is race self-proclaimed? What is the rule for persons who marry persons of another race?

*Id.* at 663 (quoting *Smith*, 158 Md. App. at 702).

In *Janey,* a "foreign" witness identified an African American defendant as the individual who requested assistance shortly after the crime. We held that it was not error for the trial court to deny the defense request for a cross-racial identification instruction because "(1) [the witness's] identification of Janey was not a critical issue in the case, and (2) in any event, [the witness's] identification was corroborated by Janey's childhood friend, Jones, who placed Janey at [the witness's] filling station." *Janey*, 166 Md. App. at

34

664. We concluded that the requested instruction was not necessary because it "would have merely confirmed that [the witness's] self-professed difficulty in recognizing African American faces was consistent with 'the experience of many." *Id*. at 664-65. On this record, we held that the New Jersey instruction "could have had no significant influence on the outcome of deliberations." *Id*. at 665.

In *Tucker v. State*, 407 Md. 368, 382 (2009), the issue was not whether to give any cross-racial identification instruction, but to give the one used in that case. The Court of Appeals held that it was error for the trial court to instruct the jury that "[t]here is no particular reason to think that cross-racial identification applies to eyewitnesses in actual criminal cases," because that "was an inaccurate statement of the law[.]" *Id.* In doing so, the Court indicated that it is inappropriate for the court to express either judicial disapproval or approval of the underlying premise that identifications made by witnesses who are not of the same race are unreliable. *Id.*

Applying lessons from these decisions to this evidentiary record, we are satisfied that the trial court did not abuse its discretion in denying appellant's request for a cross-racial identification instruction. As the trial court recognized, this was not the prototypical scenario contemplated in the New Jersey instruction, involving an uncorroborated identification of the accused by a stranger with a different racial background. Although S.L.H. and M.L. apparently are Hispanic, they both knew appellant, who is African American, because they lived next door for two and a half years. Each witness separately identified appellant in a photo array. Both expressed certainty that appellant was the person who fired at the victim, fled with the gun, and ran into appellant's home.

35

In these circumstances, we cannot say that the trial court abused its discretion in harboring concerns that a cross-racial identification instruction would prejudice or confuse the jury, by suggesting that jurors should disregard or discount the identifications made by S.L.H. and M.L., based solely on the difference in appellant's race. As we recognized in *Janey*, a court may reasonably exercise its discretion by considering whether such an instruction will be misunderstood as a judicial directive that the cross-race effect is a universal phenomenon at work in every identification involving a witness and suspect of a different race or ethnicity.

Analogous concerns arise regarding the other components of the proposed instruction, including the detailed language about "weapon focus" and photo arrays. As discussed, there are cogent reasons to refrain from "imposing a rule requiring instructions regarding [specific] factors to consider in witness identification[.]" *Janey*, 166 Md. App. at 663. Based on this record, we are satisfied that the briefer Maryland analogs to the New Jersey pattern instructions fairly covered those topics. Accordingly, the trial court did not err or abuse its discretion in declining to give the lengthy instruction proposed by appellant, and instead using the Maryland pattern instruction for witness identifications.

> **JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

36

# APPENDIX

Appellant's requested instruction on cross-racial identification, taken from the New Jersey pattern, is as follows:

(Defendant), as part of [his/her] general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that [he/she] is the person who committed the alleged offense. The burden of proving the identity of the person who committed the crime is upon the State. For you to find this defendant guilty, the State must prove beyond a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

The State has presented the testimony of [insert name of witness who identified defendant]. You will recall that this witness identified the defendant in court as the person who committed [insert the offense(s) charged]. The State also presented testimony that on a prior occasion before this trial, this witness identified the defendant as the person who committed this offense [these offenses]. According to the witness, [his/her] identification of the defendant was based upon the observations and perceptions that [he/she] made of the perpetrator at the time the offense was being committed. It is your function to determine whether the witness's identification of the defendant is reliable and believable, or whether it is based on a mistake or for any reason is not worthy of belief. You must decide whether it is sufficiently reliable evidence that this defendant is the person who committed the offense[s] charged.

Eyewitness identification evidence must be scrutinized carefully. Human beings have the ability to recognize other people from past experiences and to identify them at a later time, but research has shown that there are risks of making mistaken identifications. That research has focused on the nature of memory and the factors that affect the reliability of eyewitness identifications.

Human memory is not foolproof. Research has revealed that human memory is not like a video recording that a witness need only replay to remember

37

what happened.  Memory is far more complex.  The process of remembering consists of three stages: acquisition -- the perception of the original event; retention -- the period of time that passes between the event and the eventual recollection of a piece of information; and retrieval -- the stage during which a person recalls stored information.  At each of these stages, memory can be affected by a variety of factors.

Relying on some of the research that has been done, I will instruct you on specific factors you should consider in this case in determining whether the eyewitness identification evidence is reliable.  In evaluating this identification, you should consider the observations and perceptions on which the identification was based, the witness's ability to make those observations and perceive events, and the circumstances under which the identification was made.  Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony.  Such identifications, even if made in good faith, may be mistaken.  Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification.

If you determine that the out-of-court identification is not reliable, you may still consider the witness's in-court identification of the defendant if you find that it resulted from the witness's observations or perceptions of the perpetrator during the commission of the offense, and that the identification is reliable.  If you find that the in-court identification is the product of an impression gained at the out-of-court identification procedure, it should be afforded no weight.  The ultimate question of the reliability of both the in-court and out-of-court identifications is for you to decide.

To decide whether the identification testimony is sufficiently reliable evidence to conclude that this defendant is the person who committed the offense[s] charged, you should evaluate the testimony of the witness in light of the factors for considering credibility that I have already explained to you. In addition, you should consider the following factors that are related to the witness, the alleged perpetrator, and the criminal incident itself.  In particular, you should consider [**choose appropriate factors from one through five below**]:

**(1) The Witness's Opportunity to View and Degree of Attention:**  In evaluating the reliability of the identification, you should assess the witness's opportunity to view the person who committed the offense at the time of the offense and the witness's degree of attention to the perpetrator at the time of

the offense.  In making this assessment you should consider the following [**choose appropriate factors from (a) through (g) below**]:

**(a) Stress:**  Even under the best viewing conditions, high levels of stress can reduce an eyewitness's ability to recall and make an accurate identification. Therefore, you should consider a witness's level of stress and whether that stress, if any, distracted the witness or made it harder for him or her to identify the perpetrator.

**(b) Duration:**  The amount of time an eyewitness has to observe an event may affect the reliability of an identification.  Although there is no minimum time required to make an accurate identification, a brief or fleeting contact is less likely to produce an accurate identification than a more prolonged exposure to the perpetrator.  In addition, time estimates given by witnesses may not always be accurate because witnesses tend to think events lasted longer than they actually did.

**(c) Weapon Focus:**  You should consider whether the witness saw a weapon during the incident and the duration of the crime.  The presence of a weapon can distract the witness and take the witness's attention away from the perpetrator's face.  As a result, the presence of a visible weapon may reduce the reliability of a subsequent identification if the crime is of short duration. In considering this factor, you should take into account the duration of the crime because the longer the event, the more time the witness may have to adapt to the presence of the weapon and focus on other details.

**(d) Distance:**  A person is easier to identify when close by.  The greater the distance between an eyewitness and a perpetrator, the higher the risk of a mistaken identification.  In addition, a witness's estimate of how far he or she was from the perpetrator may not always be accurate because people tend to have difficulty estimating distances.

**(e) Lighting:**  Inadequate lighting can reduce the reliability of an identification.  You should consider the lighting conditions present at the time of the alleged crime in this case.

***

**(2) Prior Description of Perpetrator:**  Another factor for your consideration is the accuracy of any description the witness gave after observing the incident and before identifying the perpetrator.  Facts that may be relevant to this factor include whether the prior description matched the photo or person picked out later, whether the prior description provided details or was just general in nature, and whether the witness's testimony at

39

trial was consistent with, or different from, his/her prior description of the perpetrator. [**Charge if appropriate:** You may also consider whether the witness did not identify the defendant at a prior identification procedure or chose a different suspect or filler.]

**(3) Confidence and Accuracy:** You heard testimony that (insert name of witness) made a statement at the time he/she identified the defendant from a photo array/line-up concerning his/her level of certainty that the person/photograph he/she selected is in fact the person who committed the crime. As I explained earlier, a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification. Although some research has found that highly confident witnesses are more likely to make accurate identifications, eyewitness confidence is generally an unreliable indicator of accuracy.

**(4) Time Elapsed:** Memories fade with time. As a result, delays between the commission of a crime and the time an identification is made can affect the reliability of the identification. In other words, the more time that passes, the greater the possibility that a witness's memory of a perpetrator will weaken.

**(5) Cross-Racial Effects:** Research has shown that people may have greater difficulty in accurately identifying members of a different race. You should consider whether the fact that the witness and the defendant are not of the same race may have influenced the accuracy of the witness's identification.

[The jury should also be charged on any other relevant factors in the case.]

In evaluating the reliability of a witness's identification, you should also consider the circumstances under which any out-of-court identification was made, and whether it was the result of a suggestive procedure. In that regard, you may consider everything that was done or said by law enforcement to the witness during the identification process. You should consider the following factors: [**Charge if appropriate**]:

**(1) Lineup Composition:** A suspect should not stand out from other members of the lineup. The reason is simple: an array of look-alikes forces witnesses to examine their memory. In addition, a biased lineup may inflate a witness's confidence in the identification because the selection process seemed so easy to the witness. It is, of course, for you to determine whether the composition of the lineup had any effect on the reliability of the identification.

40

**(2) Fillers:** Lineups should include a number of possible choices for the witness, commonly referred to as "fillers." The greater the number of choices, the more likely the procedure will serve as a reliable test of the witness's memory. A minimum of six persons or photos should be included in the lineup.

**(3) Multiple Viewings:** When a witness views the same person in more than one identification procedure, it can be difficult to know whether a later identification comes from the witness's memory of the actual, original event or of an earlier identification procedure. As a result, if a witness views an innocent suspect in multiple identification procedures, the risk of mistaken identification is increased. You may consider whether the witness viewed the suspect multiple times during the identification process and, if so, whether that affected the reliability of the identification.

(Motion to Correct the Record, filed October 19, 2017) (footnotes omitted).