*Larry Harriston v. State of Maryland,* No. 739, September Term, 2019.  Opinion by Wells, J.

**CRIMINAL LAW — STATE'S CLOSING ARGUMENT — BURDEN SHIFTING**

In closing argument, while the State may not comment on a defendant's failure to testify or provide evidence, the State may fairly comment on the evidence.

**CRIMINAL LAW — STATE'S CLOSING ARGUMENT — "OPENING THE DOOR" DOCTRINE**

Analysis of State's comments under the "opening the door" doctrine show that the comments were specifically in response to defense counsel's closing remarks, rather than commentary on the defense's failure to supply evidence.

**CRIMINAL LAW — JURY INSTRUCTIONS — CROSS-RACIAL IDENTIFICATION**

A court does not abuse its discretion in declining to give a cross-racial identification instruction where, as here, the defense argues that an eyewitness' identification of the defendant "[was] not corroborated by other evidence giving it independent reliability."

**CRIMINAL LAW — JURY INSTRUCTIONS — CROSS-RACIAL IDENTIFICATION**

The precedent established in *Janey v. State*, 166 Md. App. 645, 664-65 (2006) and *Kazadi v. State*, 240 Md. App. 156, 194 (2019), *rev'd on other grounds*, *Kazadi v. State*, 467 Md. 1 (2020), instruct trial courts to resolve discretionary matters, such as the propriety of a cross-racial identification instruction, based on the unique facts in a given case.

**CRIMINAL LAW — JURY INSTRUCTIONS — CROSS-RACIAL IDENTIFICATION**

The court did not abuse its discretion in declining to give a cross-racial identification instruction where the eye-witness, though of a different race from appellant, had known appellant and interacted with him at different times for over a decade.

Circuit Court for Baltimore City
Case No. 118144001

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 739

September Term, 2019

_____

LARRY HARRISTON

v.

STATE OF MARYALND

_____

Berger,
Wells,
Salmon, James P.
          (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, J.

_____

Filed:  June 1, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

A jury sitting in the Circuit Court for Baltimore City convicted appellant, Larry Harriston of first-degree murder, use of a firearm in the commission of a crime of violence, and possession of a regulated firearm by a prohibited person.  The court sentenced him to life imprisonment.  Harriston appeals and presents two questions for our review:

1. Did the trial court abuse its discretion by permitting improper prosecutorial closing argument?

2. Did the trial court abuse its discretion by refusing to propound a jury instruction on cross-racial identification?

We answer both questions in the negative and affirm.

## BACKGROUND

On March 16, 2018, Baltimore Police Department ("BPD") responded to a homicide on the 2800 block of Hillen Road.  There were no witnesses, and the victim had already been transported to the hospital when BPD arrived on scene. Detective Curtis McMillion and his partner, Detective Storie, and Sergeant Lloyd,[1] recovered shell casings from the scene and obtained video footage from security cameras at four nearby buildings.  Det. McMillion testified the footage showed the victim sitting on the steps of a church and a man coming out of an alley and shooting him multiple times.

Det. McMillion circulated stills from the video footage through BPD email and on the BPD Twitter account.  On March 17, Sergeant Anthony Maggio contacted Homicide

---

[1]  The record does not mention Det. Storie's or Sgt. Lloyd's first names.

saying he recognized the person in the stills. Sgt. Maggio then met with Det. McMillion and identified the suspect as Harriston.

Sgt. Maggio testified he knew Harriston from his time working in the Eastern District between 2004 and 2007 when Harriston was young and went by the nickname "Little Larry." In fact, when Sgt. Maggio first contacted BPD after seeing the still from the surveillance footage, he said he believed the suspect was Little Larry, and called back later to provide the full name of Larry Harriston. Sgt. Maggio testified that he would chat with Harriston as a kid and say "'hey, what's up, Larry,' things like that." Sgt. Maggio testified that he saw Harriston less frequently—approximately ten to 15 times—and did not interact with him between 2007 and 2017 because Sgt. Maggio was working in different districts. Sgt. Maggio testified that other than Harriston's height, his appearance did "[n]ot really" change much.

Det. McMillion testified that he and Det. Storie spoke with Harriston's sister, Shatia Manigo, at her place of work on April 12. Det. McMillion testified that the detectives presented the stills to Manigo, who said that a person depicted in one still (not holding a gun), at trial, marked as State's Exhibit 2A, "look[ed] like" Harriston. While Manigo affirmed this in her own testimony, she also testified that she only *positively* identified Harriston in a different photo that she viewed on one of the detective's cell phones. That photo was marked at trial as State's Exhibit 1. Manigo further testified that as to the two other stills she was shown, State's Exhibits 2B and 2C, she had said she could not be sure that the person was Harriston, in Exhibit 2B and that the person shown was not Harriston in Exhibit 2C.

Tyrika Hill, Harriston's girlfriend, testified that BPD showed her the stills and footage on April 15. She testified that she was not able to identify the person in State's Exhibit 2A, but that she identified Harriston in State's Exhibits 2B and 2C. She testified that she could not identify the person depicted in the video footage.

Manigo also provided the detectives with Harriston's phone number. Det. McMillion testified that he obtained a search and seizure warrant for the cell phone and cell phone number, in hopes of obtaining the location data of the user at the time of the homicide. Det. McMillion received the data but testified that he did not attempt to obtain an analysis because he determined based on the subscriber information the phone did not belong to Harriston.

Harriston was indicted in the Circuit Court for Baltimore City on charges of first-degree murder, second-degree murder, use of a firearm in the commission of a crime of violence, and possession of a regulated firearm by a prohibited person. After a trial that spanned from January 28 through January 30, 2019, a jury convicted Harriston of first-degree murder, use of a firearm in the commission of a crime of violence, and possession of a regulated firearm by a prohibited person. On May 14, 2019 the court sentenced Harrison to life imprisonment. This timely appeal followed.

Additional facts will be supplied as necessary.

## DISCUSSION

### I.     State's Closing Argument—Burden-Shifting

Harriston contends that comments made during the prosecutor's closing argument impermissibly shifted the burden of proof to the defense in that they misled the jury into

believing the defense was obligated to refute the State's evidence or to provide countervailing evidence before it could challenge the State's failure to pursue a lead. The State asserts the prosecutor's comments did not amount to burden-shifting, and instead were permissible as a narrowly tailored response to the defense's comments on the State's failure to investigate the cell phone data. The State adds that the prosecutor's full recitation of the jury instructions on the defense's lack of burden were more than sufficient to ensure the jury was aware the defense had no obligation to provide evidence. We agree with the State.

Since a burden-shifting claim is an allegation of a violated constitutional right, our review is without deference to the circuit court. *Molina v. State*, 244 Md. App. 67, 174 (2019) (citing *Savage v. State*, 455 Md. 138, 157 (2017)).

This Court's recent analysis in *Molina* illustrated that burden-shifting claims, made in response to prosecutorial comments on a lack of evidence supporting the defense, are borne out of the defendant's constitutional right to refrain from testifying. 244 Md. App. at 174. There, we explained that the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights provide a defendant with the right not to have the prosecutor comment on his decision not to testify. *Id.* (citing *Savage v. State*, 455 Md. 138, 157 (2017)). We also explained how this constitutional right may be implicated by a prosecutor's attacks on a lack of evidence provided by the defense:

> Maryland decisional law has interpreted this prohibition to protect defendants from indirect comments as well as direct ones. Indeed, the Court of Appeals has observed that a prosecutor's comment on a "defendant's failure to produce evidence to refute the State's evidence . . . might well amount to an impermissible reference to the defendant's failure to take the

4

stand." But even if the comment was not "tantamount to one that the defendant failed to take the stand," the Court continued, "it might in some cases be held to constitute an improper shifting of the burden of proof to the defendant."

The State's comment on the defense's failure to produce evidence, however, will not always amount to impermissible burden-shifting. For instance . . . the State may "argue or comment that the unexplained possession of recently stolen goods permits the inference that the possessor was the thief." In fact, the State can even request that the court instruct the jury that such an inference is permissible. This is because a factual inference in the State's favor, left unrebutted by the defense, does not shift to the defendant a burden either of persuasion or of going forward with evidence.

But the State may not exceed the bounds of permissibly commenting on the absence of evidence by commenting, instead, directly on the defendant's failure to testify.

*Id.* at 174–75 (internal citations omitted).

*Smith v. State*, 367 Md. 348 (2001), is instructive for distinguishing between permissible and impermissible comments. There, the defendant was found in possession of stolen leather goods and did not testify. *Id.* at 351–52. The prosecutor instructed jurors to ask themselves, "What evidence has been given to us *by the defendant* for having the leather goods? Zero, none." *Id.* (emphasis in original). The Court of Appeals held those comments violated the defendant's constitutional right to remain silent, explaining:

The prosecutor did not suggest that his comments were directed toward[ ] the defense's failure to present witnesses or evidence; rather, the prosecutor referred to the failure of the defendant alone to provide an explanation. The prosecutor's comments were therefore susceptible of the inference by the jury that it was to consider the silence of the defendant as an indication of his guilt, and, as such, the comments clearly constituted error.

*Id.* at 358.

We compared *Smith*'s facts to the facts before us in *Molina*, where the defendants claimed the prosecutor impermissibly shifted the burden of proof to them and effectively commented on their failure to testify. *Molina*, 244 Md. App. at 172–73. At issue were the prosecutor's comments in closing:

> We listened to about two hours of Ana Molina's attorney talk to us about facts that are simply not correct. . . But where in those two hours did you hear anything about where that money went and why that money was spent in [Gustave's] best interests or according to his wishes? When did you hear that? For two hours we listened. When did you hear it? When did you hear that?

*Id.* at 171–72. In contrast to *Smith*, we found these comments permissible, distinguishing them "as highlighting the lack of any evidence explaining the defendant's possession of recently stolen goods," rather than amounting to comment on the defendant's own failure to testify. *Id.* at 176.

In *Pietruszewski v. State*, 245 Md. App. 292, No. 209 September Term, 2018 (filed April 7, 2020), 2020 WL1685811, the defendant claimed the State improperly shifted the burden of proof to the defense when the prosecutor pointed out in closing that the defendant's alibi witnesses never went to the police to explain where the defendant was on the day of the robbery, as well as comments about the quality of the defense's evidence. Slip op. at 10-11. But this Court nonetheless rejected his claim, explaining that,

> We agree with the State that the challenged argument in this case merely pointed out the weakness in the credibility of Pietruszewski's alibi witnesses, including the lack of corroborating evidence that their testimony suggested would have been reasonably available. The prosecutor's references—both to the lack of any documentation and to the witnesses' delay in coming forward with exculpatory information before trial—were directed at the credibility of the testimony that was given by the witnesses.

6

*Id.* at 322.

*Pietruszewski* was consistent with a much earlier decision by our Court in *Funkhouser v. State*, 51 Md. App. 16 (1982). There, the defendant claimed the prosecutor made an "improper comment on his failure to testify," pointing to two statements made in closing:

> We have presented all the evidence to you. What about the defendant's case? Interesting. Not one bit of evidence is offered as far as the rape itself or the kidnapping. . . .
>
> \*        \*        \*
>
> Five witnesses are called. None speak of the rape or the kidnapping. All they talk about is a fight that night, a fight at the house. . . .

*Id.* at 29. Noting the circuit court provided instructions to the jury explaining the defendant had a right not to testify and that his exercise of that right could not be used against him, this Court held the prosecutor's statements were permissible: they did not refer to the defendant's failure to testify, but rather the general lack of evidence. *Id.* at 30. We concluded, "A prosecutor should not be precluded from making fair comment on the entire evidence; not every neutral or indirect reference that the State makes which implicitly refers to a defendant's silence is improper comment." *Id.*

In *Burks v. State*, 96 Md. App. 173 (1993), in support of a self-defense argument, defense counsel attempted to characterize one of the murder victims as a person known to be violent. *Id.* at 204. In closing arguments, the prosecutor, according to this Court, aptly pointed out the defendant's self-defense argument consisted more of defense counsel's own "speculative rhetoric than it did of hard evidence." *Id.* at 204–05. The defendant claimed the prosecutor's comment in rebuttal was improper:

7

What I want to know is, how do you know that the defendant is not capable of violence? Whose word do you have for that? The defense counsel's word for it ultimately because nobody came here to tell you he is not capable of violence. It is the defendant only who testified, and now I want to remind you, how do you know that Marvin Willis had been a violent person before this week? Because a defendant who claims self-defense is entitled to bring witnesses in here. . .

*Id.* at 203–04.  This Court did not find the comments improper, explaining it did "not remotely read" the prosecutor's comments as shifting the burden of persuasion to the defense.  *Id.* at 204.  Instead, we opined that pointing out such a shortcoming was the "purpose of jury argument."  *Id.* at 205.

The State argues that *Mitchell v. State*, 408 Md. 368 (2009) is dispositive.  There, our Court of Appeals used the "opening the door" doctrine[2] to analyze a prosecutor's comments on the defense's failure to subpoena witnesses.  In closing, defense counsel listed persons who had been discussed at trial but were not called to testify.  *Id.* at 376.  He said the absence of those witnesses created "a situation where a misidentification could take place," and suggested

Let's bring Wal[i] Henderson here so we can see if he's a heavyset, dark-skinned man. Let's bring Antonio Corprew here so we can gauge his stature. Let's look at Man–Man, what does he look like? Get that hat out of the car. Does that hat fit his head?

*Id.* at 377.  The prosecutor responded in his closing by saying:

---

[2] Our Court of Appeals recently explained "[t]he open door doctrine authorizes admitting evidence which otherwise would have been irrelevant in order to respond to . . . admissible evidence which generates an issue. In short, the doctrine makes relevant what was irrelevant. Given the doctrine's ability to enlarge the universe of relevant evidence at trial, 'the opening the door doctrine' is a rule of expanded relevancy." *State v. Robertson*, 463 Md. 342, 352 (2019) (internal quotations and citations omitted).

The defense made mention a couple times about what the State didn't present to you all. We never saw Cochran, never saw Corprew, never saw Turner, never saw Wal[i] Henderson....

\* \* \*

If [defense counsel] thought that them being here would have shown that something we presented was so contradictory to something about them, he could have brought them in as well. The defense has subpoena power just like the State does. You can't say why didn't the State present a witness, when they had an equal opportunity to present it to you, and then try to say, well, it wasn't presented. They had an equal right to present it if they thought it would contradict something we presented.

*Id.* at 377, 379.  The Court of Appeals held the prosecutor's statements amounted to "fair comment" on the ground that defense counsel's statement "opened the door" for the prosecution to draw attention to the defense's subpoena power.  *Id.* at 387–88.  The Court highlighted that the defense, by suggesting it would have been helpful for additional named persons to testify, "argued the relevancy of their absences and the weakness in the State's case."  *Id.* at 388–89.

Here, in closing argument, Harriston's attorney said the following:

[DEFENSE COUNSEL]: [T]here was one thing that the sister did was she gave them my client's phone number that he then verified through another source.  So he then put that in a search and seizure warrant and said, hey, we know – Judge, under perjury, that's his phone.  They get the records.  It has hundreds of pages that have coordinates, GPS tracking, everything, but because the name doesn't say Larry Harriston, the detective goes oh, well, that's useless.

I'm on a family phone plan.  My mother, my father, my sister, my son . . . You pull any of their phone records it will have my name on it.  I assure you I don't have six different phones.  To not even bother going down a couple floors within your own department to have the IT person run all that information to be able to tell you where that phone was.  Don't you think you'd like to have that information instead of just doing the officer's approach?  Let me just stick my head in the sand and guess what I'm showing you instead because that's what this detective did.

And later, counsel revisited the point, saying:

9

I think the most offensive one is the cell phone records. They can tell you exactly where that phone was. And if – so think about it. If someone is at a store that's not at the scene, that's not in that direct neighborhood, goes from there and comes back and you had cell phone records that would show the phone pinging in the one area and then in the next area and then back in that area, that, ladies and gentlemen is what I would call evidence.

And during the State's rebuttal closing, the prosecutor said the following:

[PROSECUTOR]: So, ladies and gentlemen, I'm going to read you something from the jury instructions. I want to make sure its abundantly clear that the Defense does not have any burden. It is the State's burden to prove this case. He is presumed – the defendant is presumed to be innocent of the charges. This presumption remains throughout every stage of the trial. It is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty. The State bears the burden of proving guilt of the defendant beyond a reasonable doubt. This means that the State has the burden of proven [*sic*] beyond a reasonable doubt each and every element of the charges – the crimes charged. The elements of the crime are the component parts of the crime of which I will instruct you shortly. This burden remains with the State throughout the trial. The defendant is not required to prove his innocence; however, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence. A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of the fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. If you are not satisfied of the defendant's guilt to that extent for each and every element of the crime charged, then reasonable doubt exists and the defendant must be found not guilty of that crime.

I read that because I am in no way, shape or form trying to shift the burden onto the defendant, but when the Defense tells me he is most offended by the phone records not being checked, who submitted those for identification to have the detective look at them? The Defense. They had the same phone records. He has no obligation to put on a case whatsoever. They chose to put on a case. Why didn't they talk about the phone records? He had them the entire time. The coordinates that he talked about, was so outraged –

[DEFENSE COUNSEL]: Your Honor, I'm going to object.

10

[THE COURT]: Overruled.

[PROSECUTOR]: -- that was not followed up on. So outraged. He had the same documents. And I raise this only because in closing the Defense raised it. And again, I reiterate for the record, he has no obligation. It is the State's burden and you have that jury instruction and because it is so important it is number two right here. It's my burden and I'm in no way, shape or form trying to say that it is the Defense burden. But ask yourself that question with regard to the phone records[.]

As is apparent from this review of the case law, Maryland appellate courts have not been quick to label as burden-shifting prosecutorial closing comments on a shortage of defense evidence. In the one instance our search revealed where our courts held the comments impermissible, the prosecutor spoke directly to the *defendant's* failure to provide evidence. We have little trouble concluding the prosecutor's comments here do not fit that category. Unlike *Smith*, the prosecutor did not call out Harriston's failure to provide an explanation for his innocence. *See supra*, *Smith*, 367 Md. at 351–52 (holding the prosecutor engaged in burden-shifting when he instructed jurors to ask themselves, "What evidence has been given to us by the defendant for having the leather goods? Zero, none.").

The prosecutor's comments are dissimilar to those in *Smith* in another important respect. While the prosecutor pointed out the defense did not discuss the phone records, a lack of explanation for the records' (still unknown) contents is not indicative of Harriston's guilt—and certainly not to the same extent as a lack of explanation for a defendant's possession of stolen goods. That both parties chose not to investigate or discuss the phone records at trial, despite having the ability, yields no implication in either party's favor. The

11

prosecutor's comments may have neutralized the defense's statement, but they did not shift the burden.

In this same vein, we view the prosecutor's comments in the context of the opening the door doctrine, as an express response to defense counsel's closing remarks. We agree with the State that its comments on the defense's ability to analyze the cell phone data are similar to those upheld in *Mitchell* regarding the defense's subpoena power. In our view, the *Mitchell* prosecutor's comment that the defense could have subpoenaed witnesses if it "thought it would contradict something [the State] presented" might even have been closer to burden-shifting than the instant case. 408 Md. at 379. The prosecutor's comments here do not come so close to implying the defense's failure to discuss the phone records means the State's case is incontestable. Rather, the prosecutor's comments suggest the phone records may not have been significantly helpful to either party's case.

We also do not read the overall message of the prosecutor's comments to be "that the defendant should have produced certain evidence," as Harriston asserts. Reading the prosecutor's comment as a response to defense counsel's closing, the statement that would come closest to burden-shifting—"But ask yourself [why didn't they talk about the phone records?]"—is not a suggestion that Harriston's case hinged on his explanation of the phone records. Rather, it was an instruction for the jury to consider the defense's argument that the State failed to investigate important evidence in light of the defense's own failure to use the documents.

For these reasons, we can find no fault in the prosecutor's comments. Even if we did, we could not ignore that the prosecutor emphasized the defense was not obligated to

12

analyze the phone records. In *Funkhouser*, this Court was persuaded simply by the trial court's provision of the burden instructions in holding that either burden-shifting had not occurred, or that if it did occur it was corrected. *Funkhouser*, 51 Md. App. at 30. Given that, here, those instructions were provided by the trial court and again by the prosecutor, we conclude the jury would have been aware a verdict of not guilty did not hinge on the defense's explanation of the phone records.

In sum, we do not find the prosecutor's closing comments amounted to burden-shifting. Instead, they were a narrowly tailored response to the defense's closing remarks.

## II.     Cross-Racial Identification Instructions

Harriston contends the circuit court abused its discretion in declining to provide a cross-racial instruction, since this case was one where "identification [was] a critical issue" and the "eyewitness's cross-racial identification [was] not corroborated by other evidence giving it independent reliability"—factors Harriston says make such an instruction a requirement. The State disagrees, saying that no Maryland appellate court has ever held a cross-racial instruction to be required, and that one was particularly unnecessary here since Sgt. Maggio's identification of Harriston was not a cross-racial identification of a stranger, but of a person Sgt. Maggio knew. For the reasons that follow, we concur with the State.

We review a trial court's decision on whether to provide a cross-racial identification instruction for an abuse of discretion. *Kazadi v. State*, 240 Md. App. 156, 190 (2019), *rev'd on other grounds*, 467 Md. 1 (2020).

In *Gunning v. State*, 347 Md. 332 (1997), our Court of Appeals made clear the appropriateness of an identification instruction cannot be measured in "absolute[s]":

13

If a party requests an instruction on identification, therefore, the trial judge should first evaluate whether the evidence adduced at trial suggests the need for the requested instruction. In making this determination the court *might consider* such factors as any equivocation associated with the identification, the extent to which mistaken identification is reasonably at issue and the existence of, or lack of corroboration of the eyewitness identification.

We do not find instructions on such issues to be always mandatory, but neither do we consider them never necessary nor *per se* improper. . . We instead recognize that an identification instruction may be appropriate and necessary in certain instances, *but the matter is addressed to the sound discretion of the trial judge.*

*Id.* at 347–48 (emphasis added).

Our search reveals four reported cases from Maryland appellate courts reviewing the provision of cross-racial identification instructions. None of these opinions held the trial court abused its discretion in failing to give such an instruction. *See Kazadi*, 240 Md. App. at 191 (explaining at the time of that opinion (February 2019), only three such cases had been reported and none had found an abuse of discretion in the refusals below).

First, in *Smith v. State*, 158 Md. App. 673, 689 (2004), *rev'd on other grounds*, 388 Md. 468 (2005) ("*Smith I*"), we held the circuit court had not abused its discretion in refusing to provide a cross-racial identification instruction where the witness expressed that she was particularly good with faces, and "there was no evidence of any problem associated with cross-racial identification." *Id.* at 704. We similarly held the court did not err in disallowing defense counsel from arguing issues of cross-racial identification in closing arguments, since there was no evidence race played a factor in the witness' identification of the suspect. *Id.* at 705–06. The Court of Appeals reversed our decision on the latter issue, reasoning that because "the victim's identification of the defendants was

14

anchored in her enhanced ability to identify faces . . . defense counsel should have been allowed to argue the difficulties of cross-racial identification in closing argument." *Smith v. State*, 388 Md. 468, 488–89 (2005) ("*Smith II*"). The Court of Appeals did not reach the separate issue of the cross-racial identification instructions. *Id.* at 470.

Next, in *Janey v. State*, 166 Md. App. 645 (2006), we affirmed the circuit court's refusal to give a cross-racial identification instruction where a store clerk made a cross-racial identification of a person who stopped by his business. We addressed the test for the propriety of such instructions adopted in New Jersey:

> In *Cromedy*, 727 A.2d at 467, the New Jersey Supreme Court emphasized that an instruction on cross-racial identification "should be given only when ... [1] identification is a critical issue in the case, and [2] an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." Consequently, even if Janey had been tried in New Jersey, where the *Cromedy* standard requires that an instruction on cross-racial identification be given under certain circumstances, it would not have been reversible error for the trial judge to refuse to grant the instruction in Janey's case because (1) Akhtar's identification was not a critical issue in the case, and (2) in any event, Akhtar's identification was corroborated by Janey's childhood friend, Jones, who placed Janey at Akhtar's filling station.

*Janey*, 166 Md. App. at 664 (2006).[3] We also noted that because the witness testified he had difficulty identifying African-American persons, a cross-racial instruction would have been redundant. *Id.* at 664–65.

Most recently in *Kazadi v. State*, we affirmed the circuit court's refusal to give the *Cromedy* cross-racial identification instructions where two Hispanic witnesses

---

[3] *Cromedy* was abrogated in *State v. Henderson*, 208 N.J. 208 (2011). There, the New Jersey Supreme Court ruled that enhanced instructions on the reliability of identification testimony would be required and directed that state's committee on pattern jury instructions to draft enhanced instructions. 208 N.J. at 296-99.

independently identified an African-American defendant. 240 Md. App. at 192, 194. We found persuasive the trial judge's consideration of the fact that the witnesses expressed certainty in identifying the defendant, and that the defendant was their neighbor of two-and-a-half years. *Id.* at 194. We held the trial judge had not abused his discretion, given his observations that this was "not the prototypical scenario contemplated in the New Jersey [cross-racial] instruction," and that the instruction might "prejudice or confuse the jury, by suggesting that jurors should disregard or discount the identifications made by [the witnesses], based solely on the difference in appellant's race." *Id.* We reiterated our position from *Janey* that "a court may reasonably exercise its discretion by considering whether such an instruction will be misunderstood as a judicial directive that the cross-race effect is a universal phenomenon at work in every identification involving a witness and suspect of a different race or ethnicity." *Id.*

Harriston's argument hinges largely upon two passages he quotes from *Janey*:

> Conversely, the mere fact that a witness denies any difficulty in making cross-racial identifications should not deter the trial judge from considering giving such an instruction, particularly if, in the language of the *Cromedy* court, "identification is a critical issue in the case, and [the] eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." 727 A.2d at 467. Even in the face of a witness's strenuous denial of personal difficulty in making cross-racial identifications, because the studies cited by the Court of Appeals in [*Smith* II] at 478–86, indicate that there is a "strong consensus among researchers ... that some witnesses are more likely to misidentify members of other races than their own," *id.* at 482, the trial judge must, upon request, consider whether an instruction is appropriate in the case.

> Accordingly, our holding in this case—that the trial judge did not abuse his discretion in refusing to give the requested instruction on cross-racial identification—should not be interpreted as holding that it is never appropriate to give such an instruction. Nor should the fact that no instruction

16

> on cross-racial identification appears yet in the Maryland Criminal Pattern Jury Instructions serve as the basis for an arbitrary refusal to consider granting such an instruction.

166 Md. App. at 665–66. Harriston concludes from this a cross-racial instruction "would be *required* in a case in which 'identification is a critical issue' and in a case in which the 'eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability,'" as in the instant case. We disagree with this reading of *Janey* and Harriston's application of this rule to the record.

While in *Janey* we generally supported consideration of the two factors Harriston points to, we referenced the *Cromedy* test to emphasize that even in a jurisdiction where a concrete test *had* been adopted, a cross-racial instruction would not have been required on *Janey's* facts. We did not go so far as to present those factors as part of a required test in Maryland. This is clear from our conclusion in *Janey* that the Court of Appeals' most recent opinion dealing with cross-racial identification instructions at that time, *Smith II*, "did not impose any new duty upon trial judges to give jury instructions addressing cross-racial identification." 166 Md. App. at 662–63. It is also apparent from our subsequent statement that "it would be helpful if the Court of Appeals provided guidance as to when and under what circumstances" it would be "appropriate for a trial court to mention specific factors [the jury should consider in its evaluation of eyewitness testimony], including cross-racial identification." *Id.* at 667.

*Janey*, and more recently, *Kazadi*, make clear that Maryland courts are yet to require cross-racial identification instructions in certain scenarios. Instead, *Janey* made clear a

17

trial judge may not arbitrarily refuse to provide a cross-racial identification instruction: "[I]t would be an abuse of discretion for the trial judge to apply a uniform policy of rejecting all requested instructions that are not covered by some pattern instruction." 166 Md. App. at 666. Rather, the trial judge should "resolve discretionary matters" with "regard to the particulars of the individual case." *Id.* (quoting *Gunning*, 347 Md. at 352).

Here, the circuit court did not arbitrarily refuse to provide the instructions. The judge explained her consideration of the case's unique facts:

> THE COURT: Here's the thing, I'm never tied completely to the Patterns. I'm not. But I'm not – I don't feel comfortable giving the cross-racial identification instruction that you've requested mainly because I don't - it's – it applies here. We are dealing with a witness who indicated that he had absolutely zero problem – he wasn't able to place your client's name to the person that he remembered at first, but he remembered him as Little Larry. Given what I've heard I am going to decline that instruction because I don't think it's appropriate.

The court's rationale—that there was no evidence of the witness' difficulty in identifying the suspect, and that the witness *knew* the suspect beyond having merely seen him—reflects relevant considerations from the case law. In *Smith I*, we found a cross-racial identification instruction unnecessary when there was no evidence the witness had difficulty identifying the suspect or that race affected the identification at all. 158 Md. App. at 704–06. And in *Kazadi*, we were persuaded the instruction was unnecessary where the witness and suspect had been neighbors for two years. 240 Md. App. at 192, 194.

But even if our courts were bound by the *Cromedy* test, we still would likely not find the cross-racial instruction was required. The cross-racial identification that occurred in this case was offset by the fact that Sgt. Maggio knew Harriston prior to identification.

18

Sgt. Maggio had not merely seen Harriston before but had varying levels of interaction with him over the course of more than a decade. Sgt. Maggio testified to seeing and chatting with Harriston when Harriston was younger, and frequently enough that Sgt. Maggio used Harriston's childhood nickname. Sgt. Maggio testified to seeing Harriston around in subsequent years, although less frequently, and said Harriston's appearance had not changed much. Further, Sgt. Maggio's identification of Harriston as the suspect in the footage was corroborated, albeit in piecemeal fashion, by his sister's and girlfriend's identification of him in different stills.

Since no test on the propriety of cross-racial identification instructions has been adopted by Maryland courts, the decision to provide or decline the instruction was a matter left to the sound discretion of the circuit court. Since the circuit court exercised that discretion by considering the unique facts of the case, we conclude it did not abuse its discretion in refusing to provide such an instruction.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY THE COSTS.**